USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2134 PATRICK J. O'CONNOR, Plaintiff, Appellant, v. ROBERT W. STEEVES, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Paul F. Denver with whom Neil Rossman and Rossman, Rossman & _______________ ____________ ___________________ Eschelbacher were on brief for appellant. ____________ John Foskett with whom Deutsch, Williams, Brooks, DeRensis, _____________ ______________________________________ Holland & Drachman, P.C., Nancy Merrick, Merrick & Louison, Charles H. ________________________ _____________ _________________ __________ Riley, Jr. and Ganz, Ham & Riley were on brief for appellees. __________ _________________ ____________________ May 28, 1993 ____________________ CYR, Circuit Judge. Patrick O'Connor, former Superin- CYR, Circuit Judge. _____________ tendent of Public Works for the Town of Nahant, Massachusetts ("Town"), was discharged following an extended feud with Select- man Robert Steeves. O'Connor sued the Town and its three select- men Steeves, Harry Edwards and Richard Lombard for violat- ing his First Amendment rights to freedom of speech and political association. The district court granted summary judgment for all defendants. I I BACKGROUND BACKGROUND __________ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(c); Mesnick v. General _______ _______ Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 112 _________ _____ ______ S.Ct. 2965 (1992). All reasonable inferences are to be drawn in favor of the party opposing summary judgment, in this case appellant O'Connor, just as all disputed facts are viewed in the light most favorable to him. See Goldman v. First Nat'l Bank, ___ _______ _________________ 985 F.2d 1113, 1116 (1st Cir. 1993); Garside v. Osco Drug, Inc., _______ _______________ 895 F.2d 46, 48 (1st Cir. 1990). On the other hand, we will not credit "conclusory allegations, improbable inferences, and unsup- ported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., ____________ _________________________ 896 F.2d 5, 8 (1st Cir. 1990). 2 A. The Town A. The Town ________ Nahant, Massachusetts, is a municipality of approxi- mately 4,200 people, located north of Boston. Under the Town Charter, a three-member Board of Selectmen serves as the "chief policymaking agency of the town." Selectmen serve staggered three-year terms; one seat on the Board is filled by election each year. Among their other duties, the Selectmen are charged with appointing a Superintendent of Public Works (hereinafter "Superintendent"), whose duties are defined in the Town Charter: He shall administer, under the supervision and direction of the Selectmen, a Department of Public Works and the highway, water, sew- er, cemetery, tree warden and health departments. He shall also administer, under the supervision and direction of the Select- men, such other departments under their su- pervision as the Selectmen may designate, except the fire and police. He shall be responsible for the administration of all departments within the scope of his duty, and shall hold office subject to the will of the Selectmen. He shall be specially fitted by education, training and experience to perform the duties of said office. . . . During his tenure, he shall hold no other elective or appointive office, nor shall be engaged in any other business or occupation. . . . and shall, subject to the approval of the Select- men, appoint such assistants, agents and employees as the performance of the duties of the various departments under his supervision may require. The job description for the position notes that it is "performed with professional independence and considerable latitude for independent administrative judgment" and that "[e]rrors could result in major loss of time and expenses." It also notes that 3 the Superintendent "makes frequent contacts with other officials and the general public." Commensurate with these responsibili- ties, the Superintendent receives a salary of $41,286; by comparison, the Nahant Police Chief and Nahant Fire Chief each receive $41,365, and the Nahant Superintendent of Schools re- ceives $48,000. Lower level salaries in the Department of Public Works ["Department"] range from $20,000-$24,000 for laborers to $31,000-35,000 for foremen. B. O'Connor's Appointment B. O'Connor's Appointment ______________________ Prior to 1989, Robert Steeves served as Superintendent. The Town's three Selectmen at the time were Jayne Solomine, Richard Lombard, and Charles Kelley. In February 1989, following Kelley's death, Steeves was elected to the Board of Selectmen, triggering a search for a replacement Superintendent. The position was advertised as requiring "an associates degree in civil engineering or five years experience in related engineering fields." Although O'Connor had no engineering degree, he submit- ted an application for the position. O'Connor had worked in construction prior to 1963; then as a foreman in a local manufac- turing plant; then, following his retirement, in various posi- tions for the Rynn Corporation, a family-owned construction company. More to the present point, perhaps, O'Connor had been active in the Solomine, Kelley, and Lombard election campaigns, having headed Solomine's initial campaign for public office in 1983. On July 20, 1989, O'Connor was appointed Superintendent, 4 by a 2-1 vote, with Lombard and Solomine voting in favor. Steeves voted against the appointment, stating that O'Connor was unqualified and had been appointed because of his connections to the Lombard and Solomine election campaigns. C. Steeves and O'Connor C. Steeves and O'Connor ____________________ Notwithstanding O'Connor's appointment as Superinten- dent, Steeves continued his hands-on involvement in the Depart- ment, dealing with vendors, directing personnel, and making various small purchases on the Department's account. O'Connor believed that Steeves' continuing involvement "undermined" O'Connor's authority within the Department, and on several occa- sions in late 1989 O'Connor told Steeves he should stay "out of doing my job." At around the same time, O'Connor became aware of Steeves' practice of purchasing goods for personal use through the Department account, which was not subject to the 5% Massachu- setts sales tax. Although Steeves later repaid the Department for these purchases, the record does not indicate that the sales tax was ever paid. After discussing the matter with Town Accoun- tant Joseph Canty, O'Connor concluded that the practice was improper, and asked Steeves to stop "so we could have some accountability through the financial system and all these invoic- es and everything else." Steeves did not respond. When his approaches to Steeves proved unsuccessful, O'Connor complained to Selectmen Lombard and Solomine about Steeves' conduct, including the improper use of the Department account. In January or February 1990, O'Connor wrote the Board, 5 detailing his complaints about Steeves' purchasing practices. The letter was discussed at a "public meeting" of some kind, although O'Connor is not sure whether any members of the public were in attendance. Selectman Lombard told Steeves to stop using the Department account, and wrote all department heads directing them to instruct employees not to charge purchases on department accounts without authorization. In response to Lombard's letter, O'Connor drafted an internal memorandum prohibiting unauthorized purchases on the Department account. The memorandum had little noticeable effect. Steeves continued to charge personal pur- chases on the Department account. In March 1990, O'Connor addressed another memorandum to the Board, again describing Steeves' personal use of the Depart- ment account, and requesting that these practices be stopped. Lombard read the memorandum at another Board meeting and issued Steeves another warning, but apparently Steeves did not terminate the practice. The various disputes between O'Connor and Steeves led to increased friction within the Department. By the spring of 1990, as all parties concede, the Department's employees had divided into two factions, which communicated poorly, apparently on unfriendly terms. 2. The Town Water Crisis 2. The Town Water Crisis _____________________ In late March 1990, shortly before the annual Town election, larger events temporarily distracted the parties from the dispute over Steeves' purchasing practices, and caused them to focus instead on the breakdown of communications within the 6 Department. Three consecutive readings of the Town water supply revealed bacterial contamination; under Massachusetts law, the Department was required to notify the public and the Massachu- setts Department of Environmental Protection ("DEP"), and to take steps to safeguard the Town water supply. O'Connor was notified of the contamination during a family emergency, and called on Steeves to take charge of notifying the DEP. Steeves later insisted that he promised O'Connor no specific assistance. Phillip Applin, a Department employee, testified that although he provided information to Steeves at O'Connor's direction, he did so with hesitation, "because Mr. Steeves was not supposed to be involved with bothering the Public Works employees." Applin also testified that, as late as April 6, 1990, O'Connor and Steeves obviously had not yet spoken to each other about whether the DEP had been notified. Apparently as a result of the breakdown in communications between the parties, neither DEP nor the Town was notified about the contamination for several days, and a number of Town residents became seriously ill. The perceived mishandling of the water contamination problem generated considerable public controversy, and became an important factor in the April, 1990 elections. Selectman Jayne Solomine, who supported O'Connor, was replaced by Harry Edwards, a Steeves supporter. Edwards later stated that he had been ap- proached, prior to the election, by voters concerned about O'Connor's performance during the Town water crisis, and that he viewed his election as a mandate to remove O'Connor as Super- 7 intendent. D. O'Connor's Termination D. O'Connor's Termination ______________________ Following Edwards' election and the correction of the water contamination problem, O'Connor resumed his complaints about Steeves' unauthorized purchasing practices. In May or June, O'Connor presented the Board with another invoice for a personal purchase by Steeves on the Department account. O'Connor also approached Edwards, the new Selectman, seeking to discuss Steeves' misuse of Department accounts. Edwards appeared unin- terested. At a Board meeting on May 24, 1990, Lombard moved to reappoint O'Connor as Superintendent; Edwards and Steeves blocked the motion. On June 28, 1990, Lombard again moved to reappoint O'Connor, but once again Edwards and Steeves blocked the reap- pointment. Edwards then moved to terminate O'Connor, but with- drew the motion without explanation. On July 12, 1990, O'Con- nor's termination again came up for a Board vote. Just before the vote, O'Connor left the meeting, went to his office, and returned with a number of Department invoices signed by Steeves, then proceeded to describe Steeves' improper conduct to those in attendance, stating that he wanted the townspeople to know "what was really going on in the city hall."1 ____________________ 1O'Connor apparently succeeded in piquing public interest about Steeves' purchasing practices. Following O'Connor's termination, the Essex County District Attorney requested "an audit of the Town's procurement policies, practices and proce- dures." The State Auditor ultimately identified 32 purchases of goods totalling approximately $2600 by individuals for 8 Lombard voted against O'Connor's termination; Edwards and Steeves voted in favor. Edwards later said he voted to ter- minate O'Connor because of the "mandate" he had been given by voters after the Town water crisis. Steeves later stated that he voted to terminate O'Connor because of O'Connor's alleged in- volvement in Solomine's unsuccessful reelection bid, and because O'Connor allegedly had told a Department employee not to vote for Edwards during the April 1990 elections, which O'Connor denies. In August, 1990, O'Connor sued, alleging, inter alia, that he had _____ ____ been discharged in retaliation for his political affiliation with Solomine, and for his accusations against Steeves.2 II II DISCUSSION DISCUSSION __________ A. Political Discharge A. Political Discharge ___________________ A public employee may not be discharged, demoted, or disciplined for political activities or beliefs, unless political affiliation or belief is an appropriate job qualification for the particular position. See Rutan v. Republican Party of Illinois, ___ _____ _____________________________ 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980); Elrod ______ ______ _____ ____________________ their own use. The audit noted that "the practice of allowing individuals to purchase items through the town is improper, if not illegal, and holds the town at risk of paying for any pur- chases that are not identified as personal purchases." The audit did not identify the individuals responsible for these improper purchases. 2The district court dismissed O'Connor's various other claims under federal and state law on the merits. O'Connor does not challenge those dismissals. 9 v. Burns, 427 U.S. 347 (1976). Assuming, without deciding, that _____ political affiliation was a "motivating factor" for O'Connor's discharge, see Mt. Healthy City School Dist. Bd. of Education v. ___ ______________________________________________ Doyle, 429 U.S. 274, 287 (1977); see also Acosta-Sepulveda v. _____ ___ ____ ________________ Hernandez-Purcell, 889 F.2d 9, 12-13 (1st Cir. 1989); Rosado v. _________________ ______ Zayas, 813 F.2d 1263 (1st Cir. 1987), we affirm the grant of _____ summary judgment against O'Connor, since we conclude that politi- cal affiliation was an appropriate requirement for the Superin- tendent position. Although "[t]he difficulties in determining whether a government employee is protected from a politically motivated discharge are considerable," Agosto-de-Feliciano v. Aponte-Roque, ___________________ ____________ 889 F.2d 1209, 1214 (1st Cir. 1989) (en banc), the test we apply is familiar. First, we inquire whether the overall functions of _________ the employee's department or agency involve "decision making on issues where there is room for political disagreement on goals or their implementation," Jimenez Fuentes v. Torres Gaztambide, 807 _______________ _________________ F.2d 236, 241-42 (1st Cir. 1986) (en banc), cert. denied, 481 _____ ______ U.S. 1014 (1987); see also Rodriguez-Burgos v. Electric Energy ___ ____ ________________ _______________ Auth., 853 F.2d 31, 35 (1st Cir. 1988); Goyco de Maldonado v. _____ ___________________ Rivera, 849 F.2d 683, 684-85 (1st Cir. 1988). Second, we decide ______ whether the particular responsibilities of the plaintiff's __________ ________________ position, within the department or agency, resemble those of "a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement" for continued 10 tenure. Jimenez Fuentes, 807 F.2d at 242. Among the indicia _______________ material to the second element are "'relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.'" Id. (quoting Ecker v. Cohalan, ___ _____ _______ 542 F.Supp. 896, 901 (E.D.N.Y. 1982)); see also Mendez-Palou v. ___ ____ ____________ Rohena-Betancourt, 813 F.2d 1255, 1258-59 (1st Cir. 1987); see _________________ ___ generally Stott v. Martin, 783 F.Supp. 970, 976-82 (E.D.N.C. _________ _____ ______ 1992) (collecting First Circuit case law following Jimenez Fu- ___________ entes). _____ The summary judgment record establishes beyond perad- venture that the Department "handled matters potentially subject to partisan political differences," Mendez-Palou, 813 F.2d at ____________ 1258, not unlike governmental departments in larger municipali- ties. See Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th ___ _______ ________________ Cir. 1985), cert. denied, 474 U.S. 946 (1985) (cautioning against _____ ______ "unduly myopic view" of "the role of politics in the seemingly apolitical context of universal provision of services"). The primary function of any local government entity is the provision of services such as police and fire protection, public schools, hospitals, transportation, and libraries, as well as quasi-utility functions such as wa- ter, garbage, and sewage services. Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the de- velopment and implementation of plans to 11 achieve that goal. Id. Here, the Department's role in the life of the Town plainly ___ parallels the Water Department's role in Tomczak, which repeated- _______ ly has been cited in this circuit as a benchmark for evaluating the political responsibilities of public employment. See, e.g., ___ ____ Collazo Rivera v. Torres Gaztambide, 812 F.2d 258, 260 (1st Cir. _______________ _________________ 1987) (finding administration of agrarian reform programs, by Puerto Rico's Regional Housing Administration, "at least as important to partisan political goals as the provision of water discussed in Tomczak"); see also Cordero v. De Jesus-Mendez, 867 _______ ___ ____ _______ _______________ F.2d 1, 15 (1st Cir. 1989) (finding "no evidence of comparable responsibility" between Water Director's position in Tomczak and _______ plaintiff's position as Administrative Aide to the Assistant Director of Public Works in Town of Moca, Puerto Rico); Roman _____ Melendez v. Inclan, 826 F.2d 130, 133 (1st Cir. 1987) (finding ________ ______ duties of Regional Manager in Puerto Rico's General Services Administration "analogous, in general character," to that of Water Director in Tomczak).3 It also offers clear confirmation _______ ____________________ 3Like the Water Department in Tomczak, the Department _______ performed "quasi-utility functions" for virtually all community residents, and, therefore, was capable of attracting significant public attention in the context of a local election campaign. The same can be said, of course, about many other public and municipal agencies and departments. Thus, for example, we have held this first prong of the Jimenez Fuentes test to have been _______________ met by the position of Regional Director of the Puerto Rico General Services Administration, insofar as that agency was responsible for determining "the degree of attention [to be given] the physical conditions of public buildings . . . which buildings need immediate or special care, . . . whether to give priorities to rural or urban schools," Roman Melendez, 826 F.2d ______________ at 134; the Puerto Rico Department of Natural Resources, which "formulates and implements public policies that potentially 12 of Tomczak's continuing validity: by all accounts, as the _______ district court pointed out, the 1990 elections for Town Selectman turned in large part on the Department's failure to assure safe drinking water to Town residents. Moreover, whatever difficulties we might face in applying the second prong of the Jimenez Fuentes test to subor- _______________ dinate positions within the Department, see, e.g., Cordero, 867 ___ ____ _______ F.2d at 14-15 (finding political affiliation inappropriate job requirement for assistant director of public works), the Superin- _________ tendent's "inherent responsibilities" under the Town Charter, as the person "responsible for the administration of all departments within the scope of his duty," plainly "'had a bearing on the ____________________ implicate partisan interests," Monge-Vazquez v. Rohena-Betan- _____________ _____________ court, 813 F.2d 22, 26 (1st Cir. 1987); accord Navas Chabran v. _____ ______ _____________ Santiago Nieves, 666 F.Supp. 16, 18 (D.P.R. 1987); and the Puerto _______________ Rico Urban Development and Housing Corporation, which partici- pates in "the provision of housing to low and middle income city residents . . . a vital political issue," Jimenez Fuentes, 807 ________________ F.2d at 241-44. O'Connor challenges any analogy to Tomczak, asserting that _______ "the duties, size of staff and budget of the First Deputy Commis- sioner of the Water Department of Chicago . . . differ material- ly" from those of the Nahant Superintendent. It is true, of course, that the $4O million operating budget and 1,150 employees controlled by the Water Department in Tomczak greatly exceed _______ O'Connor's $60,000 departmental budget and fifteen person staff. But we think O'Connor's direct comparison, based exclusively on departmental size and budget, overlooks the equally dramatic differences in the populations and municipal budgets of Chicago and Nahant. Chicago's population is approximately 2.8 million; Nahant's approximately 4,200. Chicago's annual budget is approx- imately $3.2 billion; Nahant's approximately $4 million. We do not think governmental provision of essential public services is any the less prone to politicization in smaller communities; municipal services are as essential to the few as to the many. In light of the broader scope of the public services it provides, we think the role of the Department in the political life of Nahant is at least comparable to that of the Water Department in __ _____ Chicago. Cf. Cordero, 867 F.2d at 15. ___ _______ 13 partisan goals and policies'" of the Department as a whole. Rodriguez-Burgos, 853 F.2d at 35 (quoting Mendez-Palou, 813 F.2d ________________ ____________ at 1263). O'Connor protests that, in practice, his position involved little managerial responsibility, and he was in fact "essentially a working foreman." As we have held, however, "the actual past duties of the discharged employee are irrelevant if ______ the position inherently encompasses more expansive powers and __________ more important functions that would tend to make political af- filiation an appropriate requirement for effective performance." Mendez-Palou, 813 F.2d at 1258 (emphasis added). Accordingly, ____________ absent ambiguity in the official job description, the analysis must focus upon the "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." Jimenez Fuentes, 807 F.2d at 242; see also, e.g., _______________ ___ ____ ____ Batistini v. Aquino, 890 F.2d 535 (1st Cir. 1989); Mendez-Palou, _________ ______ ____________ 813 F.2d at 1258; cf. Stott, 783 F.Supp. at 976 n.6 (noting that ___ _____ the Jimenez Fuentes court "did review plaintiffs' testimony about _______________ their actual duties," and concluding that "such testimony may be useful in filling gaps left by the official job description and in amplifying the responsibilities listed in the description . . . [though not] to belittle the job into one with less signif- icant responsibilities"). The district court carefully, and in great detail, analyzed the job description for the position of Superintendent, and its unchallenged findings that seventeen of twenty-three listed duties are "policymaking," "representative," or "per- 14 sonnel" functions comport with our "common sense judgment" on the matter. See Jimenez Fuentes, 807 F.2d at 242. As the ___ _______________ district court correctly determined that O'Connor's political affiliation was an appropriate criterion for the position that he held, we affirm its grant of summary judgment on the political discharge claim. B. "Whistleblowing" Claim B. "Whistleblowing" Claim _____________________ O'Connor's alternative claim presents a closer ques- tion. Essentially, O'Connor contends that he was discharged because he disclosed Steeves' unauthorized use of the Department account; that these disclosures dealt with a matter of signifi- cant public concern; and that his First Amendment right to speak out on the subject against the interests of Steeves, his elected superior outweighed the Town's demonstrated interest in protecting Department operations from any resulting disrup- tions and inefficiencies. We agree, and since we are unable to conclude, on the present record, that O'Connor's discharge could _____ not have resulted from his protected speech (as opposed to his ___ unprotected speech, or his job performance as Superintendent), we must vacate the grant of summary judgment for the Town and remand to the district court for further proceedings. 1. Legal Standard and Standard of Review 1. Legal Standard and Standard of Review _____________________________________ A government employee retains the First Amendment right to speak out, as a citizen, on matters of public concern, so long as the employee's speech does not unduly impede the government's 15 interest, as employer, in the efficient performance of the public service it delivers through its employees. Pickering v. Board of _________ ________ Educ., 391 U.S. 563, 568 (1968); see also Rankin v. McPherson, _____ ___ ____ ______ _________ 483 U.S. 378 (1987); Connick v. Myers, 461 U.S. 138 (1983); _______ _____ Brasslett v. Cota, 761 F.2d 827 (1st Cir. 1985). Three tests _________ ____ determine whether the court is presented with an actionable claim for the infringement of a public employee's First Amendment rights. First, the court must determine, on the basis of "the _____ content, form, and context of a given statement, as revealed by the whole record," whether the employee was speaking "as a citizen upon matters of public concern," or, alternatively, "as an employee upon matters only of personal interest." Connick, _______ 461 U.S. at 147-48. If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern," then its First Amendment value is low and "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision" arising therefrom. Id. at 146-47. ___ Second, if the employee did speak out on a matter of ______ public concern, the court must balance the strength of the employee's First Amendment interest, and any parallel public interest in the information which the employee sought to impart, against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its employees. Pickering, 391 U.S. at 568; Brasslett, 761 F.2d at 839. Though _________ _________ 16 often imprecise, [t]his balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are employers, _________ concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of pub- lic functions. On the other hand, "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech. Rankin, 483 U.S. at 384 (citations omitted; emphasis in origi- ______ nal). As the Connick and Pickering determinations depend on _______ _________ whether the employee statements "are of a character which the principles of the First Amendment . . . protect," Connick, 461 _______ U.S. at 150 n.10, these determinations are always subject to de __ novo review. Id.; see also Rankin, 483 U.S. at 385-86; Brass- ____ ___ ___ ____ ______ ______ lett, 761 F.2d at 835; see generally Bose Corp. v. Consumers ____ ___ _________ __________ _________ Union of United States, Inc., 466 U.S. 485, 499 (1984) ("in cases ____________________________ raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent exami- nation of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free speech'") (citations omitted). Third, and finally, if the court determines that the _____ public employee's First Amendment interests in speaking out 17 outweigh a legitimate governmental interest in curbing the employee speech, the plaintiff-employee must show that the pro- tected expression was a substantial or motivating factor in the adverse employment decision; and, if the plaintiff meets this test, the defendant governmental entity must be afforded an opportunity to show "by a preponderance of the evidence that [it] would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287; see also ___________ ___ ____ Duffy v. Sarault, 892 F.2d 139 (1st Cir. 1989). This third test _____ _______ implicates questions of fact; "clear error" review is appropriate where judgment was entered after a trial on the merits, see ___ Duffy, 892 F.2d at 144-45, whereas plenary review applies at the _____ summary judgment stage. See Mesnick, 950 F.2d at 822. ___ _______ 2. Threshold Inquiry: "Matters of Public Concern" 2. Threshold Inquiry: "Matters of Public Concern" _____________________________________________ The courts of appeals have adopted various approaches for determining whether a topic of employee speech is of "public concern," under the "threshold inquiry" required by Connick, 461 _______ U.S. at 146. See, e.g., D. Gordon Smith, Note, "Beyond Public ___ ____ ______________ Concern: New Free Speech Standards for Public Employees," 57 U. _________________________________________________________ Chi. L. Rev. 249, 258-61 (1990) (surveying case law). Some courts have adopted a content-based analysis, focusing exclusive- ly on "'which information is needed or appropriate to enable the members of society' to make informed decisions about the opera- tion of their government," McKinley v. City of Eloy, 705 F.2d ________ _____________ 1110, 1113-14 (9th Cir. 1983) (quoting Thornhill v. Alabama, 310 _________ _______ U.S. 88, 102 (1946)), in effect providing per se protection to ___ __ 18 public-employee speech on certain topics of "inherent" public interest, such as official malfeasance or abuse of office. See ___ Koch v. City of Hutchinson, 847 F.2d 1436, 1446 n.17 (10th Cir.) ____ __________________ (en banc), cert. denied, 488 U.S. 909 (1988). Other courts have _____ ______ adopted an analysis which turns either entirely or in part on the employee's subjective intent, i.e., on whether the employee's ____ speech "was calculated to disclose misconduct" or to inspire ___ __________ public debate on some issue of significant public interest. Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) (emphasis in _______ _____ original); see also Callaway v. Hafeman, 832 F.2d 414, 417 (7th ___ ____ ________ _______ Cir. 1987) ("while the content of [plaintiff's] communications touched upon an issue of public concern generally. . . . such speech stands unprotected from employer scrutiny when uttered in the pursuit of purely private interests"); Terrell v. University _______ __________ of Texas System Police, 792 F.2d 1360, 1362 (5th Cir. 1986), ________________________ cert. denied, 479 U.S. 1064 (1987) ("the mere fact that the topic _____ ______ of the employee's speech was one in which the public might or would have had a great interest is of little moment"); Linhart v. _______ Glatfelter, 771 F.2d 1004, 1010 (7th Cir. 1985) (Connick "re- __________ _______ quires us to look at the point of the speech in question: was it _____ the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private inter- est?").4 ____________________ 4We identify these approaches, somewhat inexactly, as the "contextual" and "content-based" approaches to Connick's thresh- _______ old test for determining the level of First Amendment speech 19 As our own case law implicitly recognizes, the circum- stances of a particular case may govern the appropriate approach under Connick. Where a public employee speaks out on a topic _______ which is clearly a legitimate matter of inherent concern to the ________ electorate, the court may eschew further inquiry into the employ- ee's motives as revealed by the "form and context" of the expres- sion. See, e.g., Brasslett, 761 F.2d at 844 n.14 (according no ___ ____ _________ apparent consideration to public employee's personal motive, where fire chief's public commentary on available fire protec- tion, and on Town Council's actions in dealing with associated problems, plainly qualified as matters of inherent "public concern"). On the other hand, public-employee speech on a topic which would not necessarily qualify, on the basis of its content __ ___ _____ __ ___ _______ alone, as a matter of inherent public concern (e.g., internal _____ ____ working conditions, affecting only the speaker and co-workers), may require a more complete Connick analysis into the form and _______ context of the public-employee expression, "as revealed by the whole record," Connick, 461 U.S. at 146, with a view to whether _______ ____________________ protection. Under the "content-based" approach, the objective content of an employee's statement is determinative, and the "form and context" of the statement are examined only in close cases, to determine whether the content of the statement is of _______ "public concern." Under the "contextual" approach, the three factors are considered seriatim. A determination that the ________ content of the expression addresses a "matter of public concern," _______ while often described as "the greatest single factor in the Connick inquiry," Breuer v. Hart, 909 F.2d 1035, 1039 (7th Cir _______ ______ ____ 1990) (quoting Belk v. Town of Minocqua, 858 F.2d 1258, 1264 (7th ____ ________________ Cir. 1988)), does not end the inquiry; in certain circumstances the employee may still be disciplined if the "form and context" of the speech indicate that the employee was driven by purely personal concerns. 20 the community has in fact manifested a legitimate concern in the __ ____ internal workings of the particular agency or department of government, and, if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse. See, e.g., Alinovi v. Worcester School Commit- ___ ____ _______ ________________________ tee, 777 F.2d 776, 787 (1st Cir. 1985), cert. denied, 479 U.S. ___ _____ ______ 816 (1986) (letters of reprimand issued to teacher by school administration did not implicate an issue of "public concern" under Connick, despite tangential connection to an incident _______ implicating the teacher's Fourth Amendment rights; "when [the teacher] posted the letters . . . she was not concerned with any _________ ____ possible violation of her Fourth Amendment rights, but rather, with [a] purely personal issue concerning the lack of action on the part of the administration regarding her disciplinary prob- lem") (emphasis added). Since "almost anything that occurs within a public agency could be of concern to the public," _____ Terrell, 792 F.2d at 1362 (emphasis in original), a full-fledged _______ "form and context" analysis is appropriate in these instances. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark and certainly every criticism directed at a public official would plant the seed of a constitutional case". See ___ Connick, 461 U.S. at 149.5 _______ ____________________ 5The circumstances presented in Connick itself required both _______ forms of analysis. There, an assistant district attorney, opposing her transfer to another department, circulated a ques- tionnaire "concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in super- 21 In our own case, O'Connor's allegations were not limited to internal personnel procedures, affecting only himself and other Department employees. Rather, O'Connor's revelations ____________________ visors, and whether employees felt pressured to work in political campaigns." 461 U.S. at 141. Analyzing the "content, form and context" of the employee's statements, the Supreme Court noted that the employee "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities . . . [or] seek to bring to light actual or potential wrongdoing or breach of trust on the part of [public officials]." Id. at 148. However, it held, that the content of ___ ___ _______ __ one question did touch upon a "matter of interest to the communi- ___ ________ ___ _____ ____ _ ______ __ ________ __ ___ ________ ty," i.e., whether assistant district attorneys were pressured to __ ____ work in political campaigns. The Court then proceeded to evalu- ate that question separately, under the second "balancing" step in the Pickering analysis. See id. at 149-154. The separate _________ ___ ___ treatment given the one item of "inherent public concern" on the employee questionnaire is consistent with our exempting such clear First Amendment speech from the full-scale threshold inquiry into the employee's motives in speaking, undertaken in Connick in relation to the other items on the questionnaire. See _______ ___ Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir.) ("[w]ere motivation _______ _______ rather than content dispositive [in Connick], the Court would _______ have had no reason to isolate the one question that was of public concern"), cert. denied, 488 U.S. 899 (1988). _____ ______ Rankin v. McPherson, supra, is the only other Supreme ______ _________ _____ Court case to consider, in depth, the application of Connick's _______ threshold test. Rankin concerned a law enforcement employee's ______ private comment to a co-worker, in the aftermath of the assas- sination attempt against President Reagan: "if they go for him again, I hope they get him." 483 U.S. at 381. The Court found that the statement, in context, "plainly dealt with a matter of __ _______ public concern," insofar as it "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President." Id. __ at 386 (emphasis added). The Court paid little attention to the "form and context" of McPherson's statement, insofar as those factors bore on her motives for speaking; indeed, if the Court _______ had done so, it probably would have found that the statement (which apparently occurred without premeditation, in a private conversation between co-workers) was motivated by little or no civic concern to inform the public on any relevant issue. Rankin ______ suggests that the courts are to proceed to the second-stage Pickering inquiry whenever public-employee speech, objectively _________ viewed in the context of a broader public discourse, addresses (with reasonable specificity) an issue or topic implicating _____ _____ "core" First Amendment concerns. 22 directly implicated a topic of inherent concern to the community official misconduct by an incumbent elected official. Given their direct bearing on Steeves' fitness for elective office, we think O'Connor's allegations of improper purchases clearly constituted a matter of legitimate public concern, obviating the need for a threshold analysis of his dominant motive for speaking out on these issues.6 Accordingly, we reject the Town's conten- tions, based on the "form and context" of O'Connor's speech, that O'Connor's personal motives should result in the denial of First Amendment protection at the threshold. Cf. Pickering, 391 U.S. ___ _________ at 572 (recognizing that government employees "are, as a class, the members of a community most likely to have informed and ____________________ 6The district court noted that the summary judgment record included only five Department invoices signed by Steeves during the entire period in question, representing cumulative personal purchases amounting to approximately $500, on which a total state sales tax approximating $20-25 would have been due. Based on these small sums, and the fact that Steeves repaid the monies expended by the Department, the district court considered Steev- es' alleged misconduct de minimis. Given their bearing on __ _______ Steeves' fitness for elective office, these improper purchases clearly pertained to a matter of legitimate public interest to the community. If their infrequency, modest amount, and repay- ment tempered their seriousness as a reflection upon Steeves' suitability for elective office, that was a matter for the Nahant electorate. See, e.g., Patrick v. Miller, 953 F.2d 1240, 1247-48 ___ ____ _______ ______ (10th Cir. 1992) (perceived illegalities in City's budgeting activities constituted topic of "inherent" public concern; "'[s]peech which discloses any evidence of corruption, impropri- ety or other malfeasance on the part of city officials, in terms of content, clearly concerns matter of public import'") (quoting Conaway v. Smith, 853 F.2d 789, 796) (10th Cir. 1988)); Breuer v. _______ _____ ______ Hart, 909 F.2d 1035, 1038 (7th Cir. 1990) (County Sheriff's ____ alleged conversion of County property was "plainly of public concern in its substance"); Brawner v. City of Richardson, 855 _______ ___________________ F.2d 187, 191-92 (5th Cir. 1988) (Police Department's alleged misconduct in covering up internal investigations was "a matter of public interest and therefore deserves constitutional protec- tion"). 23 definite opinions" about allocation of funds). 3. The Pickering Scale 3. The Pickering Scale ___________________ As the content of O'Connor's allegations was of inher- ent "public concern" for First Amendment purposes, we proceed to the second test. Under Pickering, we are required to balance the _________ significance of the interests served by the public-employee speech including the employee's interests in communicating, and the interests of the community in receiving, information "on matters of public importance" against the governmental employ- er's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission. 391 U.S. at 568-575. We note at the outset that O'Connor's motives for speaking out are properly weighed in the balance under Pickering. _________ See, e.g., Versarge v. Township of Clinton, 984 F.2d 1359, 1366 ___ ____ ________ ___________________ (3d Cir. 1993) (according "little weight," under Pickering, to _________ plaintiff's "vengeful and obstructionist interests in speaking out on issue of public concern"). Thus, insofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance _________ than speech on matters of public concern intended to serve the public interest. Id. Furthermore, we agree with the district ___ court that O'Connor's motives, prominently including the evident self-interest in preserving his position as Superintendent, were less than altruistic. Nevertheless, the legitimate interest of the Town's 24 electorate in the type of information disclosed by O'Connor represents a public benefit entitled to great weight in the Pickering balance. Id. (citing O'Donnell v. Yanchulis, 875 F.2d _________ ___ _________ _________ 1059, 1061 (3d Cir. 1989)) ("On plaintiff's side of the balance, we must also consider the interests of the public in plaintiff's speech"). O'Connor's disclosures concerned alleged abuse of public office on the part of an elected official, a matter traditionally occupying "the highest rung of the hierarchy of First Amendment values." Connick, 461 U.S. at 145.7 The strong _______ public interest in such disclosures supplements O'Connor's rela- ______ tively slight personal interest in speaking out, heavily weight- ________ ing the Pickering scale in favor of First Amendment protection _________ against retaliation for O'Connor's speech.8 On the other side of the Pickering scale, the Town has _________ yet to demonstrate its legitimate interest, as employer, in ___________ ____________________ 7See also, e.g., Vasbinder v. Ambach, 926 F.2d 1333, 1339 ___ ____ ____ _________ ______ (2d Cir. 1991) (public employee's Pickering interest is particu- _________ larly great where speech involves charges of "fraudulent and corrupt practices" or other "unlawful conduct" by elected offi- cial); but cf. Breuer, 909 F.2d at 1041 (upholding dismissal of ___ ___ ______ deputy sheriff for "whistleblowing" on corruption by sheriff, based on county's "particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforce- ment") (citation omitted). 8It is also relevant that O'Connor's factual allegations about Steeves' purchasing practices are essentially undisputed by the defendants. We are not faced with a case in which a public employee has intentionally disseminated false information. Both sides of the Pickering balance might be significantly affected in _________ such circumstances. See Brasslett, 761 F.2d at 839 ("an employer ___ _________ has a greater interest in curtailing erroneous statements than correct ones, and still a greater interest in curtailing deliber- ate falsehoods . . . . Correspondingly, an employee's interest in making public statements is heightened according to their veracity."). 25 curtailing the specific disclosures which O'Connor alleges were the basis for his termination. Although the Town has shown con- siderable disruption in the Department operations, and serious deterioration in the working relations between O'Connor and Steeves, and their respective factions, it has not yet met its burden of showing that the disruption was attributable to the exercise of O'Connor's First Amendment right to speak out on this subject, so as to warrant discharging him on speech-related grounds. On the contrary, the disruption which occurred in Department operations may as readily be attributed to unrelated factors: for example, to Steeves' allegedly unauthorized inter- ference in the Department operations. See, e.g., Zamboni, 847 ___ ____ _______ F.2d at 79 ("in evaluating the disruption, if any, that resulted from [plaintiff's] criticisms . . . the district court must consider whether any unrest was caused directly by [the plain- tiff's] speech or whether it was exacerbated by defendants' actions"). Notwithstanding O'Connor's status as a "policymaking or confidential employee," see Kinsey v. Salado Indep. Sch. ___ ______ ___________________ Dist., 950 F.2d 988, 995 (5th Cir. 1992), whose position required _____ close working relations with the Board of Selectmen, including Steeves, we cannot assume, absent some showing by defendants, that the erosion of their working relationship was due to O'Con- nor's protected speech. See Brasslett, 761 F.2d at 845-46 ___ _________ ("defendants must show that . . . [plaintiff's] allegedly pro- _________ ____ tected activity had a detrimental impact on" working relation- ______ ________ ships) (emphasis added); see also Versarge, 984 F.2d at 1367-68 ___ ____ ________ 26 (declining to consider disruptive effects of speech that was not alleged by defendants as grounds for plaintiff's expulsion). _______ One final point warrants mention. As the district court properly noted, O'Connor failed on several occasions to publicize his allegations of Steeves' misconduct directly to the ________ community; instead, he chose to direct his disclosures to the Board of Selectmen.9 Nevertheless, the decision to disclose his allegations to the Board, rather than the community at large, did not eliminate O'Connor's First Amendment interest in speaking out. See, e.g., Givhan v. Western Line Consol. Sch. Dist., 439 ___ ____ ______ _______________________________ U.S. 410, 415-16 (1979) (employee retains personal First Amend- ment right to comment on issues of public concern, even if comments are made in private; "[n]either the Amendment itself nor our decisions indicate that [the right to speak out is] lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public"); see also Rankin, 483 U.S. at 378 (private comment to co-worker ___ ____ ______ held protected under Pickering balance). Moreover, in addition _________ to controlling O'Connor's employment, the Board of Selectmen is the Town's highest elective body, with representative responsi- bility for acting in the best interests of the Town and its citizenry. Hence, O'Connor's decision to address the Board, ____________________ 9Although O'Connor raised allegations against Steeves' at several "public meetings" prior to July 1990, the district court noted that few, if any, members of the public attended these meetings. O'Connor also published several internal memoranda, on Department stationery, discussing misuse of Department accounts, but the memoranda did not mention Steeves. 27 rather than the community at large, was no mere private communi- cation, nor did it in any sense extinguish the inherent public interest in his disclosures of Steeves' alleged misconduct.10 Everything considered, and viewing the record in the light most favorable to O'Connor, we are unable to conclude that the Town's interest in suppressing O'Connor's speech outweighed the impor- tance of the legitimate public interest in O'Connor's disclo- sures.11 ____________________ 10Indeed, a public employee, whose disclosures have the potential to disrupt the employing agency or department, may act responsibly by taking steps to minimize disruption by limiting dissemination to the public authorities most directly concerned. See Rankin, 483 U.S. at 389 (noting that employee "had [not] dis- ___ ______ credited the office by making her statement in public," where offensive remark "was evidently made in a private conversation with another employee"); Hubbard v. E.P.A., 949 F.2d 453, 458 _______ ______ (D.C. Cir. 1991) ("This case does not present a situation in which a government employee has jeopardized an employer's opera- tion by calling a press conference or indiscriminately leaking sensitive information"); Breuer, 909 F.2d at 1042 (finding ______ employee's statements on official corruption unprotected, despite the fact that the employee "may have genuinely hoped to force the sheriff to make changes for the ultimate benefit of the Depart- ment," because the employee's "method . . . was to immerse himself in an intra-departmental contest with the sheriff"); Conaway, 853 F.2d at 798 ("[t]he relatively low key context in _______ which [the public employee] voiced his complaints further per- suades us that the Pickering balance tilts in his favor"). _________ 11As the district court determined, however, O'Connor's claims against the Selectmen must be dismissed on the ground of qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818 ______ __________ (1982). "Because Pickering's constitutional rule turns upon a _________ fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of the Harlow qualified ______ immunity standard," at least where substantial disruption has been shown to exist as a basis for the discharge. Bartlett v. ________ Fisher, 972 F.2d 911, 916-17 (8th Cir. 1992) (collecting cases). ______ See also Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992) ___ ____ _______ ______ ("if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual or legal 28 5. Causation 5. Causation _________ The Town may have reserved its strongest defense for the next round. On the record before us, O'Connor would have grave difficulty demonstrating that the protected speech was a "substantial or motivating" factor in his discharge by the Town. Mt. Healthy, 429 U.S. at 27412. O'Connor's alleged lack of ____________ qualifications for the Superintendent's position, combined with the public concern over the Town water crisis, may well have provided neutral, non-speech related reasons for Edwards' and Steeves' votes against O'Connor's retention. Unless O'Connor can present evidence demonstrating that the discharge was motivated by his protected speech, the Town may yet be entitled to judgment ____________________ precedent"). 12The purpose of the Mt. Healthy test is to ensure that the ___________ employee is not placed in a better position as a result of the exer- cise of constitutionally protected conduct than he would have occupied had he done nothing . . . . A borderline or marginal can- didate should not have the employment ques- tion resolved against him because of consti- tutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the cor- rectness of its decision. 429 U.S. at 285-86. Here, O'Connor's last-minute public revela- tion of Steeves' purchasing practices, at the July 10 Board meeting, suggests the precise situation which Mt. Healthy sought ___________ to avoid: an effort by O'Connor (when his discharge appeared inevitable) to place himself "in a better position" to raise a later constitutional challenge to his discharge. 29 under the Mt. Healthy test. We are not in a position to make ___________ this determination, however, as the Town assumed, for summary judgment purposes, a causal link between the protected speech and O'Connor's subsequent discharge. III III CONCLUSION CONCLUSION __________ As political affiliation was an appropriate qualifi- cation for the Superintendent position, we affirm the grant of summary judgment for the Town on O'Connor's political discharge claim. The judgment dismissing all claims against the individual defendants on the grounds of qualified immunity is likewise affirmed. Finally, we vacate the summary judgment dismissing O'Connor's "whistleblowing" claim against the Town, and remand for further proceedings consistent with this opinion. The judgment of the district court is affirmed in part, The judgment of the district court is affirmed in part, _______________________________________________________ vacated in part, and the case is remanded for further proceedings vacated in part, and the case is remanded for further proceedings _________________________________________________________________ consistent herewith. Costs are awarded to the individual defen- consistent herewith. Costs are awarded to the individual defen- ___________________ ___________________________________________ dants. The appellee Town and appellant O'Connor shall bear their dants. The appellee Town and appellant O'Connor shall bear their _____ _________________________________________________________ own costs. own costs. _________ 30