**Thomas MACLEOD, Plaintiff,**

v.

**Donald KERN, et al., Defendants.**

**No. CIV.A.03–11483–NMG.**

United States District Court,
D. Massachusetts.

July 15, 2005.

James A. Bello, Morrison, Mahoney LLP, Boston, for Umass Correctional Health, Arthur Brewer, Geri Chrisman, June Binney, Vivian Donnelly, Dr. Donald Kern, Defendants.

Stephen G. Dietrick, MA Department of Correction, Boston, for Lisa Mitchel, Timothy Hall, Defendants.

Bruce R. Henry, Morrison Mahoney LLP, Boston, for Correctional Medical Services, Umass Correctional Health, University of Massachusetts Medical Center, Arthur Brewer, Dr. Donald Kern, Geri Chrisman, June Binney, Vivian Donnelly, Defendants.

Boaz N. Levin, Morrison Mahoney LLP, Boston, for June Binney, Defendant.

Charles M. Wyzanski, Attorney General's Office, Boston, for Massachusetts De-

partment of Public Health, Murphy, Jennifer, Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

In this civil rights action brought pursuant to 42 U.S.C. § 1983, Thomas MacLeod ("MacLeod") challenges the conditions of his incarceration in a state correctional facility. MacLeod has filed a Motion for Sanctions and defendants Timothy Hall, Lisa Mitchell and Bernard Brady have filed a Motion to Stay Discovery and a Motion for Summary Judgment.

### I. *Background*

#### A. Factual Background

MacLeod, appearing *pro se,* is an inmate in the custody of the Massachusetts Department of Correction ("the DOC"). At the time the events giving rise to this action took place, he was housed at the Old Colony Correctional Center ("the OCCC"), in Bridgewater, Massachusetts. On January 5, 2004, MacLeod filed a complaint alleging violations of 42 U.S.C. § 1983 against a number of parties allegedly having associations with the facility: Donald Kern, Geri Crisman, Arthur Brewer, Correctional Medical Services, University of Massachusetts Medical Center, June Binney, Vivian Donnelly, University of Massachusetts Correctional Health, Jennifer Murphy, Massachusetts Department of Public Health, former Superintendent Timothy Hall ("Hall"), former Deputy Superintendent Lisa Mitchell ("Mitchell") and Acting Superintendent Bernard F. Brady ("Brady").

The pending motions concern only Hall, Mitchell and Brady, who will collectively be referred to as "the DOC defendants". MacLeod alleges that the food, water and medical care he received from the DOC defendants at the OCCC were constitutionally inadequate. The DOC defendants respond that they are entitled to summary judgment because plaintiff's claims lack evidentiary support.

MacLeod alleges that the food at the facility is unsafe and lacking in nutritional value but the evidence shows that the menus at the OCCC are subject to nutritional guidelines and that a registered dietician certifies the nutritional content of all meals. The DOC defendants assert that, in general, the meals are designed to be low in salt, fat and cholesterol and high in fiber.

Although most of the food is cooked at the OCCC, some is cooked at a central facility and brought in by truck. During transit, the food is stored in "volrath boxes" which keep it at a temperature above 140 degrees Fahrenheit. Upon arrival, the food is placed into warming devices that heat it to 180 degrees Fahrenheit. According to the National Restaurant Association, the "safe handling temperature" of food is 135 degrees Fahrenheit. MacLeod argues that the handling of the food results in the loss of "most, if not all" of its nutritional value but he fails to offer any evidence in support of that contention.

The food is served to the prisoners on trays which contain scratches or grooves. After each use, the trays are washed in an industrial dishwasher that reaches temperatures of 190 degrees Fahrenheit. MacLeod alleges that the trays are, however, unsanitary because the grooves could house bacteria and fungus. He also alleges that the truck used to transport the food is unsanitary but MacLeod offers no evidence that he, or any prisoner, has ever become ill as a result of unsafe food handling.

MacLeod's second claim is addressed to the water quality at the facility. He states that the water has been "yellow and un-

drinkable" on multiple occasions. He speculates that it could contain "contaminants". He offers no evidence, however, that the water has caused him or any other prisoner to become ill. To the contrary, the DOC defendants offer evidence that the water quality is checked on a monthly basis by facility personnel and they have submitted records verifying that the quality has always been acceptable. They also offer a "Letter of Recognition" that the facility received from the Massachusetts Executive Office of Environmental Affairs Department of Environmental Protection commending the facility on the drinking water quality. Plaintiff provides no evidence that the water is unsafe, instead speculating that tests by an independent lab could yield such evidence.

Finally, MacLeod criticizes the medical care he has received at the OCCC.[1] MacLeod suffers from Hepatitis C, a condition which has caused him to have repeated interaction with the medical staff. In November 2000, MacLeod discovered a lump protruding from the lower right quadrant of his abdomen. Although he visited the prison infirmary on multiple occasions during the following year, the problem persisted.

In April 2001, Dr. Kern ordered MacLeod to undergo an x-ray. The x-ray "showed a mass." As a result, MacLeod was referred to Lemuel Shattuck Hospital in Jamaica Plain, Massachusetts ("the Shattuck") where he underwent an ultrasound on April 26, 2001. The results were inconclusive.

MacLeod sent a formal grievance to defendant Correctional Medical Services ("CMS") and defendant Dr. Arthur Brewer ("Dr. Brewer"), then Medical Director of CMS. MacLeod also sent a grievance to

defendant Geri Chrisman ("Chrisman"), a registered nurse and the Administrator of Health Services at OCCC. Consequently, Chrisman interviewed MacLeod on May 14, 2001.

On September 17, 2001, "the lump was observed" at the prison infirmary and it was recommended that MacLeod see a surgeon. He consulted with the unidentified surgeon on September 30, 2001, and a provider consultation report was completed. Dr. Kern subsequently received and reviewed the report.

On June 4, 2002, a computerized tomography scan ("CT scan") was performed on MacLeod. MacLeod was subsequently referred to the gastrointestinal clinic at the Shattuck in September 2002 after "blood was detected in [his] stool." MacLeod "had a gauntlet of tests" at the Shattuck, including a colonoscopy and upper gastrointestinal exam.

During an annual physical, a substitute doctor noticed the lump and allegedly concluded that it was a hernia. On February 14, 2003, however, Dr. Kern informed MacLeod that there was "no lump", even though the pain had allegedly increased.

On various occasions, MacLeod protested about the medical services he was receiving by sending complaints to the defendants. In an April 21, 2003 letter signed by Dr. Brewer, MacLeod was notified that his case had been reviewed with Chrisman but that "[i]t appears that the medical staff is addressing your problem appropriat[e]ly." A June 11, 2003 letter from defendant Mitchell similarly notes that she had reviewed the grievances with Chrisman.

---

1. Factual background relating to plaintiff's medical history is adopted, in part, from the Report and Recommendation of Magistrate

Judge Marianne B. Bowler, accepted and adopted by this Court on March 17, 2005.

MacLeod next met with a surgeon at the Shattuck in late November 2003. The surgeon identified the presence of a hernia and scheduled surgery. The surgeon also allegedly stated that a CT scan was "needed to access [sic] any damage or other problems".

On February 3, 2004, MacLeod saw Dr. Stephen J. Drewniak, who prescribed a medication designed to treat plaintiff's Hepatitis C. Sometime thereafter, Dr. Brewer informed plaintiff he would be ineligible to receive the medication before January, 2005 because he had to be free of narcotics for one full year prior to treatment in order for it to be effective. The denial prompted another round of grievances by MacLeod to which Martin responded by reiterating that the recipient had to be free of narcotics for one year prior to receiving the medication.

### B. Procedural History

MacLeod commenced the instant action on July 15, 2003 by filing a Motion to Proceed *in forma pauperis,* which was subsequently allowed. On July 6, 2004, the University of Massachusetts Medical Center moved to dismiss. On July 15, 2004, Murphy and the Massachusetts Department of Public Health did the same. On August 5, 2004, plaintiff moved for a preliminary injunction to compel the defendants to provide him with the Hepatitis C medication he sought. The motions were all referred to Magistrate Judge Bowler. On February 8, 2005, M.J. Bowler filed a Report and Recommendation which recommended that 1) the Motion for a Preliminary Injunction be denied, 2) the Motion to Dismiss of the Massachusetts Department of Public Health be allowed and 3) the Motion to Dismiss of the University of Massachusetts Medical Center and Murphy be allowed to the extent that they were defendants in their official ca-pacities but not in their individual capacities. This Court accepted and adopted those recommendations on March 17, 2005.

On November 19, 2004, the DOC defendants filed a Motion for Summary Judgment and, shortly thereafter, they filed a Motion to Stay Discovery pending its resolution. Plaintiff filed a Motion for Sanctions based upon defendants' alleged failure to respond to interrogatories.

### II. *Legal Analysis*

#### A. Legal Standard

█ The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

█ A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-mov-

ing party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the nonmoving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## B. Analysis

Plaintiff's claims are divisible into two parts: those relating to his medical treatment and those relating to the food and water supply at the prison facility. In moving for summary judgment, the DOC defendants have submitted evidence addressed to both.

Defendants offer evidence that food was transported and stored at a sufficiently high temperature and that it was either cooked at the facility or was transported to it in a sanitary environment. The record contains no evidence that inmates ever became sick from the food. Defendants also provide evidence that a nutritionist certified the menus at the facility as being adequately nutritious and there is no evidence that the nutrition is lost during handling.

Defendants provide records demonstrating that the water supply of the facility was tested for contaminants on a monthly basis and there is no evidence that the water was ever found to be unsafe. To the contrary, the facility received a commendation from the state on the quality of its water.

■ There is also ample evidence that plaintiff's medical care was adequate. Correspondence between plaintiff and defendants detail a lengthy medical history, during which plaintiff was examined by several doctors and transported to outside facilities as necessary for tests. When procedures were found to be necessary (e.g. surgery), they were scheduled without delay.

Plaintiff objects to the fact that he was denied a particular prescription to treat his hepatitis C but the records make clear that the treatment was denied as a result of a medical judgment that it would have been ineffective in light of plaintiff's narcotics use. Plaintiff fails to present any evidence calling that medical decision into question. Thus, defendants offer strong evidence that the food, water and medical care provided to plaintiff were adequate.

Plaintiff's opposition is fatally flawed because he offers no evidence in support of his claims. Instead, he claims that "[a]t this embryonic state of these proceedings, the plaintiff does not need to prove his allegations". Plaintiff misunderstands the inquiry under Fed.R.Civ.P. 56 because, although he need not "prove" his allegations to avoid summary judgment, he must offer sufficient evidence to establish the existence of a genuine issue of material fact. He has not done so.

■ For instance, he speculates that an independent laboratory could find the water at the facility to be contaminated but the water quality records fail to bear out his claim. He asserts that the food at the facility is cooled too much, resulting in the loss of "most, if not all of it's [sic] nutritional content" but he provides no basis for that conclusion. He states that, as a result of unsanitary conditions, the risk of foodborne illness is "quite obvious", notwithstanding the complete absence of evidence that any prisoner has ever become sick or that the bacteria he refers to has ever been found to be present. He states that the truck used to transport the food is unsanitary but apparently he has never seen or examined the vehicle.

■ Speculation and conclusory allegations, unaccompanied by evidentiary support, do not suffice to avoid summary judgment. Accordingly, the DOC defendants' Motion for Summary Judgment will be allowed.[2] Defendants' Motion for a Stay of Discovery will be denied, as moot.

Plaintiff's Motion for Sanctions will be denied because contrary to his assertion, the defendants did respond to plaintiff's interrogatories. They asserted objections on the ground that a motion for summary judgment was pending, a reasonable response under the circumstances and, in any event, not one which would justify sanctions.

## ORDER

In accordance with the foregoing, the Motion for Summary Judgment of Hall, Mitchell and Brady (Docket No. 75) is **ALLOWED**, their Motion to Stay Discovery (Docket No. 72) is **DENIED**, as moot, and plaintiff's Motion for Sanctions (Docket No. 73) is **DENIED**.

So ordered.

---

**2.** Plaintiff's claims against the DOC defendants are also dismissible on the ground of qualified immunity because the plaintiff offers no evidence that they acted with "wantonness" or "deliberate indifference" as required by case law.