**Robert WAGNER and Margaret Wagner, Plaintiffs,**

v.

**CITY OF HOLYOKE, Daniel Szostkiewicz, individually, and in his official capacity as Mayor of the City of Holyoke, Marc Cournoyer, individually, and in his official capacity as Chief of Police for the City of Holyoke Police Department, Stephen Donoghue, Arthur Monfette, Arthur Therrien, International Brotherhood of Police Officers, Local 409 of the International Brotherhood of Police Officers, and Local 388 of the International Brotherhood of Police Officers, Defendants**

**No. CIV.A. 98–30170–MAP.**

United States District Court,
D. Massachusetts.

Jan. 24, 2003.

Stewart T. Graham, Jr., Hampden, MA, Bonnie G. Allen, Heisler, Fields & Feldman, Springfield, MA, for Robert Wagner, Margaret Wagner.

Harry L. Miles, John J. Green, Jr., John H. Fitz-Gibbon, Green, Miles, Lipton, White & Fitz-Gibbon, Northampton, MA, for City of Holyoke, Daniel Szostkiewicz, Mark Cournoyer, Dennis Egan.

John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, Harry L. Miles, John J. Green, Jr., John H. Fitz-Gibbon, Green, Miles, Lipton, White & Fitz-Gibbon, Northampton, MA, for Stephen Donoghue.

Michael R. Salvon, National Assoc. of Government Employees, Springfield, MA, John J. Green, Jr., John H. Fitz-Gibbon, Green, Miles, Lipton, White & Fitz-Gibbon, Northampton, MA, for Arthur Monfette.

Skoler, Abbott, Hayes & Presser, Springfield, MA, Harry L. Miles, John J. Green, Jr., John H. Fitz-Gibbon, Green, Miles, Lipton, White & Fitz-Gibbon, Northampton, MA, Christopher M. Browne, International Brotherhood of Police Officers, Springfield, MA, for Arthur Therrien.

### *MEMORANDUM REGARDING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

#### (Docket Nos. 137, 142)

PONSOR, District Judge.

#### I. *Introduction*

Plaintiff Robert Wagner ("Wagner" or "plaintiff"), a sergeant with the City of Holyoke Police Department, has charged the City of Holyoke, its former Mayor, two former police chiefs and other defendants with orchestrating a campaign of retaliation against him for disclosing to certain public bodies, and for discussing publicly, alleged misconduct within the department. His wife, Margaret Wagner, is a co-plaintiff on one count, claiming a loss of consortium.

The ten-count complaint asserts the following claims: violation of the First and Fourteenth Amendments, 42 U.S.C. § 1983 (Count One); violation of the Massachusetts Civil Rights Act, Mass. Gen Laws ch. 12, § 11I (Count Two); violation of the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185 (Count Three); common law unlawful and malicious interference with an employment

contract (Count Four); common law intentional infliction of emotional distress (Count Five); common law breach of duty of fair representation (Count Six); entitlement to a declaratory judgment to the effect that certain policies and regulations of the Holyoke Police Department violate the Massachusetts Declaration of Rights and the United States Constitution (Count Seven); infringement of the right to privacy in violation of Mass. Gen. Laws ch. 214, § 1B (Count Eight); common law defamation (Count Nine); and, by Margaret Wagner, common law loss of consortium (Count Ten).

The targets of the lawsuit are Wagner's employer, the City of Holyoke; Daniel Szostkiewicz ("Szostkiewicz"), the former Mayor of Holyoke; Marc Cournoyer ("Cournoyer"), the former Chief of Police of the Holyoke Police Department; Stephen Donoghue ("Donoghue"), another former Chief of Police of the Holyoke Police Department; Wagner's coworker and former president of Local 388 of the International Brotherhood of Police Officers, Arthur Therrien ("Therrien"); the International Brotherhood of Police Officers ("the International"); Local 409 of the International Brotherhood of Police Officers ("Local 409") and Local 388 of the International Brotherhood of Police Officers ("Local 388") (together "defendants").[1]

Defendants have moved for summary judgment on Counts One, Two, Three, Eight, and part of Nine. Plaintiffs have moved for partial summary judgment against the defendants City of Holyoke, Szostkiewicz, Cournoyer, and Therrien with respect to retaliation claims contained in Counts One, Two, Three, Four, Five, Seven, and Ten and with respect to their claim of unconstitutional application of Ho-

lyoke Police Department Regulations 1.24, 1.26, and 1.30.

Subsequent to the filing of memoranda on this motion, the First Circuit issued its opinion in *Dirrane v. The Brookline Police Department*, 315 F.3d 65 (1st Cir.2002). At oral argument, counsel had the opportunity to address the impact of *Dirrane*. Based largely on this recent authority, the court will allow most, but not all, of defendants' motion for partial summary judgment. The plaintiffs' motion will be denied.

## II. *Standard of Review*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a material fact is "one that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in the light most favorable to the nonmoving party, "drawing all reasonable inferences in that party's favor." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir.1999), *cert. denied*, 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*,

---

1. Two other defendants in the original complaint, Dennis Egan ("Egan") and Arthur

Monfette, have been dismissed voluntarily.

515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Not every genuine factual conflict, of course, necessitates a trial. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (citation omitted). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

### III. *Factual History*

The facts below are viewed in the light most favorable to the plaintiffs; all reasonable inferences are drawn in their favor.

Wagner joined the Holyoke Police Department on October 10, 1975. On January 3, 1982, he was promoted to the rank of sergeant.

In July 1991, Wagner was elevated from the rank of sergeant to the Chief of Police by then-Mayor William Hamilton. This was the first and only time that a chief did not hold the rank of lieutenant or captain prior to his appointment.

Wagner's tenure as police chief was marred by a vote of no confidence by the patrolmen's union and a motion for a vote of no confidence by the Holyoke City Council that was only narrowly defeated. One of Wagner's accomplishments as chief was his revision of the Standing Operating Procedure of the Holyoke Police Department. In September 1994, Wagner resigned as chief and resumed his rank as sergeant.

In January 1995, Donoghue was appointed Chief of Police. Later that year, the Massachusetts Attorney General's ("AG") office and Massachusetts Commission Against Discrimination ("MCAD") began investigating the Holyoke Police Department for alleged wrongdoing. The AG investigators approached Wagner in September 1995 about allegations of criminal activity and civil rights violations. Wagner cooperated with the investigation.

On December 3, 1995, Wagner filed a lawsuit in federal court alleging that the City of Holyoke and individual city councilors had conspired against him to violate his rights and interfere with his employment contract. Wagner also alleged that city officials had defamed him. The suit was dismissed on November 8, 1996 by U.S. District Judge Frank H. Freedman.

Between 1995 and 1996, Wagner met with two Holyoke police officers, Flores and Haberman, regarding claims of discrimination, departmental overtime abuse, illegal alcohol sales and gambling, and Flores' MCAD complaint. Holyoke City Councillor Diasdado Lopez attended some of these meetings.

On June 13, 1996, Donoghue reprimanded Wagner in writing for allowing Sergeant Gary Bennett ("Bennett") to leave his duties during a major fire and for submitting an untrue report on the matter. When Wagner, shortly after the incident, submitted an undated written response to the reprimand, which was critical of Donoghue's deployment of men on the night of the fire, Donoghue himself replied in another undated memo. In this memo, Donoghue criticized the "impertinent" tone of Wagner's written response, advising Wagner that he was "a subordinate whose abilities [had been] below … expectations." (Docket No. 141, Ex. 11).

On June 17, 1996, Donoghue ordered the payroll clerk to cease paying out-of-grade stipends—that is, additional pay stipends to inferior officers who assumed supervisory duties on individual shifts—to all sergeants, including Wagner.

On June 21, 1996, Wagner filed a grievance with his union, Local 409, seeking

rescission of the June 13 written reprimand. On July 3, 1996, by agreement, Donoghue and Local 409 agreed that the June 13, 1996 letter of reprimand would be removed from Wagner's file in six months if he incurred no further disciplinary action. Moreover, sometime before July 15, 1996 (the record is not clear when) Donoghue withdrew his order requiring the payroll clerk to cease paying the out-of-grade stipends. Despite this, on July 15, 1996, Wagner filed a grievance with Local 409 charging that he had been wrongfully denied the stipend. Because it believed the matter was settled, Local 409 never presented this grievance to Donoghue.

On or about September 23, 1996, Wagner, acting *pro se*, filed a rather clumsily worded prohibited practice charge with the Massachusetts Labor Relations Commission ("MLRC") against the City of Holyoke. Specifically, Wagner appears to have claimed, among other things, that Donoghue had retaliated against him for having filed the June 21, 1996 grievance, by denying him (and others) the out-of-grade stipend. *See* (Docket No. 141, Ex. 15).[2]

While still on duty, Wagner delivered a copy of this charge to the home of then-city solicitor Daniel Glanville.[3] On October 2, 1996, Donoghue reprimanded Wagner for having conducted personal business while on duty. Subsequently, Wagner amended his charge with the MLRC to cite the October 2, 1996 reprimand as another example of retaliation.

On or about September 26, 1996, Bennett filed a complaint with the MCAD pertaining to an incident occurring on August 30, 1996, when then-Lieutenant Cournoyer visited the home of Officer Jorge Rodriguez ("Rodriguez") and allegedly yelled at and threatened him. Although Rodriguez himself did not, at first, join in Bennett's complaint, or even know that Bennett had filed it, Bennett was apparently motivated to bring the action because he believed the episode reflected Cournoyer's animus against Puerto Ricans. Rodriguez subsequently joined the complaint.

Wagner did not witness the Rodriguez episode. Rodriguez, however, approached Wagner, told him about the incident, and solicited advice. Wagner advised Rodriguez to seek a formal apology and to file an internal complaint. After Bennett filed the MCAD complaint, Wagner also helped Rodriguez prepare certain paperwork related to the proceeding and accompanied Rodriguez to several MCAD hearings. Although the existing procedures apparently required officers to report to superior officers all incidents of misconduct, such as Cournoyer's alleged behavior towards Rodriguez, Wagner did not notify any superior or city official about the Cournoyer–Rodriguez incident.

In October 1996, Wagner met again with AG investigators. Among other matters, they discussed a serious allegation of misappropriation of monies belonging to several prisoners by Lieutenant Harold Valentine ("Valentine"), the head of the Holyoke Police Department crime

---

**2.** Wagner's claim on this point is confusing, because it is undisputed that Donoghue ordered the suspension of the out-of-grade stipend on June 17, 1996, four days *before* Wagner filed the grievance. *See* Defendant's Statement of Material Facts (Docket No. 140, at ¶ 8), and plaintiffs' response (Docket No. 155). Donoghue then withdrew this order some time before July 15, 1996.

**3.** It is disputed whether it was accepted practice for Holyoke police officers to conduct brief personal business matters while on duty. Wagner claims that the delivery took place during his lunch hour.

prevention bureau ("Oquendo incident").[4] Wagner provided the investigators with information and documents pertinent to the incident, but it appears undisputed that he never brought the matter to the attention of his superiors at the police department.

On January 2, 1997, Wagner wrote a letter to city personnel director David Lawrence ("Lawrence") in which he objected to newly implemented drug testing procedures because the "morally bankrupt" Donoghue "would cover up the negative results of friends of his while disciplining to the fullest extent possible anyone he felt animosity for." (Docket No. 141, Ex. 25). Wagner sent a copy of this letter to the Federal Office of Management and Budget.

On January 15, 1997, the MLRC dismissed Wagner's September 23, 1996 prohibited practice charge. Wagner responded with a letter dated February 3, 1997, expressing his dismay at the MLRC's decision.

Between February 6, 1997 to February 27, 1997, the Valley Advocate published a series of articles discussing the Holyoke Police Department. The first article reported Wagner's statements that he had been unfairly disciplined by Donoghue, that Local 409 had refused to intervene, and that he was now "at war." (Docket No. 155, Ex. 1). Wagner was also quoted

as claiming that Donoghue and his inner circle ran the department according to two sets of rules: "one for their allies on and off the force, and one for minorities and cops who complain." *Id.*

The second article attributed to Wagner and Bennett the claim that "Donoghue and his allies on and off the force regularly retaliated against officers who try to blow the whistle on wrong-doing inside the department." *Id.*

The third article recounted Wagner's cooperation with AG officials in their investigation of the Holyoke Police Department. Regarding the Oquendo incident, Wagner was quoted as commenting, "I had suspected that some cops were behaving unethically when it came to handing out unfair discipline or angling for better pay and benefits. Now we were talking about possible criminal corruption." *Id.* Wagner never notified his superiors of any alleged illegal activity connected with the Oquendo incident. He did talk to a member of the City Council and contacted the State Alcohol Beverage Control Commission about continuing illegal liquor sales known to the Holyoke Police Department.

On March 3, 1997, in response to the newspaper articles, Donoghue suspended Wagner for thirteen days and imposed two punishment tours of duty for having (1) provided Criminal Offender Record Information ("CORI") documentation[5] to

---

4. The Oquendo incident occurred sometime in October 1995, when Wagner and two other officers pulled over a car carrying three male passengers. After discovering marijuana in the ashtray and a box of money under the passenger's seat, they arrested and brought the three men back to the station. There, Valentine assumed responsibility for compiling an inventory of the box's contents. According to Wagner, Valentine's first count of the seized cash was roughly $40,000; a second count was roughly $30,000. After the three men claimed the money did not belong

to them—at which point the money should have been turned over to the city as unclaimed property—the money disappeared from departmental records. In addition, Valentine's report stated that the suspects were carrying only $6.00, whereas Wagner put the amount at $1,925. Eventually, criminal charges were brought against Valentine, but he died before they were fully litigated.

5. The CORI statute is designed to insure that sensitive criminal records are not improperly accessed and disseminated. Documents sub-

the Valley Advocate (*i.e.*, the arrest report written in connection with the Oquendo incident), (2) discussed departmental matters with the Valley Advocate, (3) disseminated information from confidential internal affairs files (a special report prepared by then-deputy chief Donoghue in connection with the actions of Holyoke officer Arthur Therrien), and (4) been insubordinate in his January 2, 1997 letter to Lawrence in which he referred to Chief Donoghue as "morally corrupt." Wagner denies having distributed either the arrest report or the special report regarding Therrien. Department regulations in effect at the time of the publication of the Valley Advocate articles (later challenged by Wagner as unconstitutional) limited the release of departmental information to the media and prohibited public criticism injurious to the morale of the department.

In a Civil Service hearing conducted on or about March 18, 1997, Mayor Szostkiewicz reduced the total number of days of suspension imposed on March 3, 1997 from thirteen to eleven, and overturned the two punishment tours of duty. Wagner appealed the remaining suspension to the Civil Service Commission. By agreement of the parties, his appeal remains in abeyance during the pendency of this litigation.

On June 16, 1997, Wagner filed a complaint with the MCAD alleging that Captain William McCoy ("McCoy") had threatened retaliation against those officers who filed MCAD complaints on behalf of Rodriguez. Subsequently, Wagner amended this MCAD complaint to include allega-

tions of loss of benefits, hostile work conditions, intimidation, stalking, and physical assault. The complaint also alleged misconduct by Officers Egan and Therrien and unethical behavior by city solicitor Edward Mitnick.

On September 23, 1997, Wagner called the Holyoke Police Department to give notice that he would not be able to attend a scheduled appearance at Holyoke District Court as he was on sick leave and appearing at an investigative conference concerning his MCAD complaint. He indicated that he was available if needed and could be reached at the MCAD. The officer handling the call reported Wagner as sick. On October 3, 1997, Donoghue imposed a five-day suspension on Wagner for filing a false sickness report and attending the MCAD hearing instead of appearing at court. This suspension was later reduced to one day by Szostkiewicz.

On September 30, 1997, Donoghue reprimanded Wagner for lying to Massachusetts State Police investigators in connection with dissemination of a confidential arrest report of Donoghue's daughter to "Hello Holyoke," a local weekly journal. Wagner denied any involvement in this incident.

On November 6, 1997, Therrien filed an internal complaint against Wagner objecting to the reference to Therrien, as well as the allegations of misconduct against him, in Wagner's MCAD complaint. On April 30, 1998, new Chief Marc Cournoyer suspended Wagner for one day based on Therrien's complaint.[6]

---

ject to the statute may not be distributed to anyone who is not "CORI certified."

6. As president of the patrolmen's union, Therrien played no part in drafting, revising, approving, or implementing departmental rules and regulations. Pursuant to these rules and

regulations, however, he was entitled to file internal complaints and grievances on his own behalf. Wagner and Therrien belonged to different Locals. Therrien was president of Local 388, the patrolmen's union; Wagner belonged to the supervisors' union, Local 409.

Sometime in April of 1998, City Councilor Lopez filed a complaint on behalf of an Hispanic woman against Officer Egan alleging verbal and physical abuse during her arrest. Officer Rodriguez filed a report corroborating the woman's allegations on April 18, 1998. Wagner contacted Rodriguez on April 21, 1998 and obtained a copy of his report.

On April 23, 1998, an Advocate article entitled "Bunker Mentality" discussed the content of Rodriguez's report. Rodriguez himself disavowed any contribution to the article. Shortly thereafter, a complaint was filed by Therrien, as Egan's union representative, against Wagner for possession of the report and for interfering with the Egan investigation.

Thereafter, an investigation headed by Lieutenant Arthur Monfette was instituted with respect to Wagner's conduct in connection with the Egan investigation. During this investigation, Wagner refused to answer certain questions and received a one-day suspension imposed by now-Chief Cournoyer on April 29, 1998.[7] On May 29, 1998, Cournoyer suspended Wagner for an additional five days for having interfered with the Egan investigation and for intimidating a subordinate officer. Wagner appealed this suspension to the Civil Service Commission.

Subsequently, Cournoyer wrote to Szostkiewicz requesting that, in light of the Egan episode, Wagner be demoted to patrolman and suspended for one year. Attorney Edward Doocey ("Doocey"), appointed by Szostkiewicz as hearing officer, determined that Wagner had interfered with an ongoing investigation and intimidated a subordinate officer, but concluded that there was insufficient evidence to conclude that Wagner had forwarded Rodriguez's report to the Springfield Advocate.

As a result of Doocey's findings, Wagner received an additional twenty-five day suspension. Wagner appealed the suspension, now totaling thirty days, to the Civil Service Commission. Proceedings before the Commission regarding this appeal have been placed on hold pending this lawsuit.

On May 26, 1998, Bennett filed a complaint, cosigned by Wagner, with the MLRC. The complaint charged that Local 409 had failed in its duty to represent him and, in particular, had refused to pursue arbitration of a grievance Bennett had filed protesting a one-day suspension. Bennett's complaint also made numerous allegations of impropriety with the police department, including money laundering by the city solicitor's office, mishandling of evidence by Officer Eva O'Connell ("O'Connell"), and O'Connell's and Therrien's misconduct in connection with the Oquendo incident. Bennett's MLRC complaint appended as an exhibit a 1974 personnel document relating to O'Connell, purportedly to demonstrate disparate treatment of departmental employees. It is disputed whether Bennett improperly retrieved this twenty-four-year-old document from a commanding officer's file cabinet. In any event, Wagner contends that the document was not confidential.

On June 11, 1998, Therrien filed another internal complaint against Wagner and Bennett, this time for the statements concerning his involvement in the Oquendo incident contained in the MLRC complaint. On August 3, 1998, Cournoyer suspended Wagner three days for releasing departmental records without proper authority in connection with the MLRC complaint.

On September 18, 1998, Cournoyer placed Wagner on administrative leave pending a psychological examination by

---

7. Donoghue retired as chief, effective December 31, 1997.

Dr. Bernard Katz ("Katz"). Cournoyer took this action, according to a letter he sent to Wagner on September 29, 1998, out of concern about recent alleged incidents involving Wagner that indicated, as Cournoyer put it, that Wagner "may [have been] suffering from serious stress." (Docket No. 141, Ex. 52). When he received the report of the examination, Cournoyer shared its contents not only with Wagner's supervisors, who might arguably have been entitled to know the details of Wagner's health, but also with others, including Captain Paquette, who were not Wagner's supervisors. It is disputed whether Paquette discussed the contents of the Katz report with an editor of the Holyoke Sun, Brian Bloom.

In February 1999, Wagner received an anonymous card while at the police department, which (interlaced with a stream of obscenities) stated "[w]e're going to get you on your way home .... So put your affairs in order because you've had your last Christmas." (Docket No. 220, Ex. 1). He reported the card to his immediate supervisor, Lieutenant Cassidy, by noting the episode on his supervisor's report, as well as to Officer Henry Wielgosz, who was also named in the card.

Soon thereafter, Cournoyer forwarded a press release to the media, in which he addressed the death threat against Wagner, stating: "This reeks of a half-hearted attempt to continue a five-year attack on this city's officials and the police department Sergeant Wagner once commanded." On February 24, 1999, Cournoyer was quoted in a Union News article, describing the death threat as "just another ploy by this group of individuals to embarrass the department and the citizens of Holyoke—this group of malcontents that have constantly barraged the city of Holyoke with complaints." (Docket No. 141, Ex. 58). Cournoyer does not recall uttering the

specific words quoted in the articles, but does not contest their substance.

Cournoyer made additional statements to the media that Wagner alleges are defamatory. Cournoyer told Union News reporter Martin Lauer that Wagner had concocted the report of a death threat as part of his running battle with the Szostkiewicz administration. Cournoyer also told reporters for television station WWLP that the report of the death threat was not on the department's original supervisor's report and that Wagner had altered his copy of the report.

On March 27, 1999, Wagner found a copy of a doctor's note to Cournoyer, which excused Wagner's absence from work due to hypertension, posted on the Platoon C clipboard at the Holyoke Police Department headquarters. Cournoyer denies placing the note on the clipboard.

On August 22, 2000, Cournoyer suspended Wagner for five days for failing to respond to a medical emergency. On the same day, he was also suspended for five days for acts of insubordination toward his superior, Captain Alan Fletcher. Wagner appealed both punishments pursuant to Civil Service rules. Newly elected Mayor Sullivan ("Sullivan") overturned the former but upheld the latter suspension.

Also on August 22, 2000, Cournoyer suspended Wagner for five days for failure to obey a direct order of the Chief of Police and for insubordination. Wagner was disciplined for walking out of Cournoyer's office after Cournoyer had summoned him there. The discipline was upheld by Sullivan on October 19, 2000.

All disciplines imposed on Wagner are now the subject of appeal, either before the Civil Service Commission or the Superior Court. As noted, proceedings in all these appeals are being held in abeyance pending the outcome of this lawsuit.

## IV. *Procedural History*

The plaintiffs filed this complaint on June 3, 1998; on September 1, 1998, the complaint was removed to federal court.

On April 30, 1999, the plaintiffs moved to enjoin the defendants preliminarily from enforcing, imposing, or maintaining discipline based upon certain departmental rules and regulations that Wagner argued were unconstitutional on their face and/or as applied to him. The court denied the motion without prejudice on August 27, 1999 in order to allow the implementation of new rules and regulations.

The plaintiffs renewed their motion for preliminary relief on January 8, 1999, in light of the defendants' communication that one year would be needed to adopt and implement new rules and regulations. In an order dated June 19, 2000, the court allowed the motion, in part, finding that departmental rules 1.26 [8] and 1.95,[9] but not others, were facially unconstitutional.

Both plaintiffs and defendants have now submitted motions for partial summary judgment. As noted, *supra* note 1, plaintiffs have agreed to dismiss defendants Dennis Egan and Arthur Monfette voluntarily.

## V. *Discussion*

As noted in the Introduction, the defendants have moved for summary judgment on the plaintiffs' federal civil rights claim (Count One), their state law civil rights claim (Count Two), their state law Whistleblower claim (Count Three), their state law Privacy Act claim (Count Eight) and part of their common law defamation claim (Count Nine). The court will address each of the defendants' arguments in order.

### A. *Federal Constitutional Claims Under 42 U.S.C. § 1983 (Count 1)*

Plaintiff contends that the City of Holyoke and his supervisors retaliated against him when he exercised his right to free speech as protected by the First and Fourteenth Amendments. The decisional law shaping the free speech protections offered to a public employee, including a police officer, has balanced the employee's interest in free expression against the interest of the governmental entity, and the public, in the reasonably smooth operation of public business.

The Supreme Court has made it clear that in order for a municipal employee to proceed with a civil rights claim for retaliation, the underlying statements that triggered the defendants' allegedly retaliatory

---

**8.** *Rule 1.26: Criticism of Other Officers*

A member or an employee of the Department shall not criticize any other member or employee except in the line of duty as a superior to a subordinate, nor shall the member or employee maliciously gossip about any superior, order, policy, procedures, case or event, nor shall a member or employee cause to discredit, lower or injure the morale of the personnel of the Department or that of any individual of the Department.

(Docket No. 21, Ex. 2, at 5).

**9.** *Rule 1.95: Releasing Information to the Media*

The Department encourages the full release of information to the news media, except where the particular details of a crime or incident should be withheld so as not to hamper an investigation. Only the Chief of Police or his designee may release information relative to questions of enforcement policy; disciplinary action against a member of the department; organizational changes; policy statements; annual reports or crime statistics; answers to criticism against the department; "mug" shots. No "off the record" statements are to be made by any members of this department, nor shall requests of the press to "hold back" or not to publish information [be] given to them.

(Docket No. 21, Ex. 2, at 12).

action must have touched on matters of "public concern." The seminal case in this area is the Supreme Court's decision in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 569, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Court later noted, *Pickering* reflected "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Court has since explained that "the government as employer indeed has far broader powers [in the First Amendment context] than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Id.* at 675, 114 S.Ct. 1878. These authorities make clear that employees' free speech rights, at least in certain circumstances, may be more restricted that the rights of the citizenry at large.

Under *Pickering*, the court must proceed in four steps. *See Tang v. Rhode Island, Dep't of Elderly Affairs*, 163 F.3d 7, 12 (1st Cir.1998); *O'Connor v. Steeves*, 994 F.2d 905, 911 (1st Cir.1993), *cert. denied, Town of Nahant v. O'Connor*, 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989), *reh'g denied*, 894 F.2d 414. First, the court must consider whether the employee was speaking "as a citizen upon matters of public concern." Garden variety employment beefs do not, in general, qualify for constitutional protection. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Vickowski v. Hukowicz*, 201 F.Supp.2d 195, 206–07 (D.Mass.2002). Second, if the speech was a matter of public concern, the court must "balance the strength of the employee's First Amendment interest, and any parallel public interest in the information ... against the strength of the countervailing governmental interest in promoting efficient performance." *O'Connor*, 994 F.2d at 912. Third, if the court finds the balance tips towards the employee's First Amendment interests, "the plaintiff-employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Id.* at 913. Fourth, if the plaintiff meets that test, "the defendant governmental entity must be afforded an opportunity to show 'by a preponderance of the evidence that [it] would have reached the same decision ... even in the absence of the protected conduct.'" *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Generally speaking, the first two factors are addressed by the court as matters of law. Thus, in the usual case, the court will have the responsibility to decide whether the plaintiff's statements addressed a matter of public concern, and whether (given the balance of interests in the specific context) the particular response to the statements was an actionable expression of retaliation. *See, e.g., Bass v. Richards*, 308 F.3d 1081, 1088 (10th Cir.2002).

The last two factors are generally for the jury. *See id.* The finders of fact will determine whether the plaintiff's protected statement (rather than, say, poor performance or violation of rules) was a substantial or motivating factor in triggering the adverse employment action, and whether, if the statement was a triggering factor, the defendant would have taken the same action even if the plaintiff had never made the statement.

■ Regarding the first factor, the record is clear that plaintiff's statements were directed to a number of matters, ranging from the relatively trivial (at least from the public's viewpoint) to the more profound. On the less serious end of the spectrum were comments regarding the handling of out-of-grade stipends, the apportionment of overtime assignments, and the proper allocation of supervisory personnel at a fire. Included within the category of less serious topics would also be the evidence of personal invective and tit-for-tat bickering among the parties. Claims of cronyism within the department would fall perhaps farther along the spectrum of protected speech. Finally, the most serious subjects of Wagner's expression included allegations of racism within the department and outright corruption—possible theft of money by officers. These latter expressions would obviously take their most serious form as communications to public entities such as the MCAD and the Massachusetts Attorney General, charged with protecting the public against serious misconduct.

Statements of the plaintiff in this latter category were manifestly directed to matters of public concern. Indeed, statements comprising evidence of possible corruption or exposing possible corruption within a police department are precisely the type of communications that demand strong First Amendment protection. As the Supreme Court has noted, speech on public issues is "the essence of self-government" and "occupies the highest rung of the hierarchy of First Amendment values." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citations omitted); *see also O'Connor v. Steeves,* 994 F.2d 905, 915 (1st Cir.1993) (official misconduct "a topic of inherent concern to the community"), *cert. denied, Town of Nahant v. O'Connor,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). The court there-fore finds that the statements made by Wagner regarding corruption and discrimination within the Holyoke police department *were* directed at matters of public concern and were entitled to protection under the First Amendment.

This finding is sufficient to dispose of the "public concern" issue, the first *Pickering* factor, for purposes of summary judgment. It is worth noting, however, that not all of the plaintiff's statements attained sufficient magnitude to constitute matters of public concern. This fact will be significant when the court addresses the individual defendants' claims of qualified immunity below.

■ Turning to the second factor, the court must consider the time, place, and manner of the employee's expression in balancing the interests served by Wagner's statements against the police department's legitimate interest in avoiding disruption of its public service mission. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Among the considerations are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

In addressing this second factor, it is important to underline that fact that law enforcement agencies, as para-military organizations, have been recognized as qualitatively different from other governmental branches; law enforcement employees are "subject to greater First Amendment restraints than most other citizens." *McMullen v. Carson,* 754 F.2d 936, 938 (11th Cir.1985) (citing *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)). "[A] police department has a

more significant interest than the typical government employer in regulating the speech activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." *Tyler v. City of Mountain Home, Ark.*, 72 F.3d 568, 570 (8th Cir.1995) (citations omitted); *see also O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C.Cir.1998).

At this second stage of the analysis, the plaintiff's motive in making the statements may become relevant. *See O'Connor v. Steeves*, 994 F.2d 905, 915 (1st Cir.1993) (weighing plaintiff's motive appropriate where plaintiff motivated by "vengeful and obstructionist interests"), *cert. denied, Town of Nahant v. O'Connor*, 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). However, generally, the *Pickering* analysis is objective. Even an employee motivated by spite may have something important to contribute to the public dialogue. Thus, the First Circuit has noted that:

> [In *Rankin* ], [t]he Court paid little attention to the "form and context" of [the plaintiff's] statement, insofar as those factors bore on her *motives* for speaking; indeed, if the Court had done so, it probably would have found that the statement . . . was motivated by little or no civic concern to inform the public on any relevant issues. *Rankin* suggests that the courts are to proceed to the second-stage *Pickering* inquiry whenever public-employee speech, objectively viewed in the context of broader public disclosure, addresses (with reasonable specificity) an *issue* or *topic* implicating "core" First Amendment concerns.

*Id.* at 912 n. 5.

In weighing the motive underlying a plaintiff's statement, and even the truth or

falsity of the statement, a trial court must strike a sensitive balance. A person is entitled to speak upon matters of public concern without putting his employment in peril if he gets the details wrong. In *Pickering*, for example, the decision of Justice Marshall upholding the right of a school teacher to criticize the school board without suffering a retaliatory termination assumed that the statements contained in the teacher's letter to a local newspaper were erroneous. 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[10] Likewise, a plaintiff who personally dislikes, or bears a grudge against, a particular individual does not necessarily lose his right to make statements regarding that individual that raise matters of public concern, even if his motive in making the statements derives partially or completely from personal animus. In weighing the second factor, in other words, the truth of the statements and the motive behind them may be examined, but these considerations are only two of what may be a number of factors to be evaluated in striking the appropriate balance between the values behind free expression and efficient administration in the specific context.

The thrust of Wagner's constitutional claim is that the defendants waged a campaign of retaliation to punish him for statements he made regarding (among other things) serious misconduct within the Holyoke Police Department—to the MCAD, the MLRC, the Massachusetts AG office, and to newspapers. Viewed in the light most favorable to Wagner, the evidence of the nature, timing, and tone of the discipline he received supports his claim. In other words, although other inferences

---

**10.** The *Pickering* court declined to decide the extent to which a knowingly or recklessly false statement would be entitled to First Amendment protections. *Id.* at 573–75, 88 S.Ct. 1731.

may perhaps be drawn from the evidence, a reasonable jury could conclude from this record that the defendants retaliated against Wagner in an effort to repress serious and legitimate criticism, to punish Wagner for his forthrightness, and to deter others from speaking publicly about matters the department wished to keep hidden. Given the seriousness of some of the matters Wagner's speech addressed, a strong argument can be made that the court should give little or no weight to Wagner's motive in making his statements, even if some of his comments might have been prompted by personal animosity.

The heart of the defendants' argument in response is that, despite the superficial appearance of some of the issues raised, the court *should* consider motive behind Wagner's speech. Indeed, the defendants argue, the energizing force behind Wagner's statements was not a public-spirited impulse to ventilate matters of vital concern to the community, but rather a personal desire to embarrass individuals within the department against whom he harbored grudges and to disrupt the department with charges that he either knew were false or which he offered with reckless disregard for their falsity. Defendants vigorously argue that all of Wagner's contributions to the public affairs discourse—including his MCAD filings, his complaints with the MLRC, and his collaboration with the state AG's office—constituted no more than manifestations of self-interest in his ongoing "war" with Donoghue, Cournoyer and others at the department.

Weighing all this, the court finds, in the Rule 56 context, that the evidence of Wagner's motive in offering statements con-

cerning police misconduct carries little weight in the second factor of the *Pickering* inquiry. As already noted, there is no question that the possibility of serious misconduct within the department is a subject of paramount public concern. *See, e.g., Campbell v. Towse,* 99 F.3d 820, 828 (7th Cir.1996) (community policing matter of public concern), *cert. denied,* 520 U.S. 1120, 117 S.Ct. 1254, 137 L.Ed.2d 334 (1997); *Breuer v. Hart,* 909 F.2d 1035, 1038 (7th Cir.1990) (alleged thefts of county property by sheriff matter of public concern). Indeed, the Supreme Court cautions that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick v. Myers,* 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). With roughly twenty years of experience, Wagner was uniquely qualified to discuss the problems of Holyoke Police Department; the public discourse was entitled to benefit from his informed perspective. *See Pickering v. Bd. of Ed.,* 391 U.S. 563, 572, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (valuing employees with "informed and definite opinions" as important contributors to public discourse). In view of all this, the court cannot conclude that, as a matter of law, defendants are entitled to summary judgment based on the analysis of the evidence on *Pickering*'s second factor.[11]

Put differently, it simply cannot be said, as a matter of law based on the undisputed facts of record, that the defendants' interest in smooth administration of the police department outweighed the interest of the plaintiff and the public in free expression. An important feature of the record supporting this conclusion is the almost com-

---

**11.** The denial of the defendants' motion for summary judgment in the analysis of *Pickering*'s second factor means that the disputed issues of fact related to this factor will be resolved via a non-jury evidentiary hearing before the court, prior to the commencement of the jury trial.

plete absence of any concrete evidence of actual disruption of the department caused by Wagner's speech. Putting aside the defendants' conclusory say-so, no evidence of record at this point suggests that Wagner's statements significantly undermined the operations of the workplace. Indeed it is hard to imagine that (beyond annoying the persons who were objects of his criticism) the complaints of one officer in a relatively large police force would either disturb the delicate balance of the workplace or significantly damage employee morale. *See Biggs v. Village of Dupo*, 892 F.2d 1298, 1303–04 (7th Cir.1990) (discharge of police officer after critical interview in paper unlawful where interview caused no disruption in police force).

Moving on to the third prong of the *Pickering* analysis, the court's analysis may be brief. On the record summarized above, a reasonable jury might conclude—drawing all inferences in the plaintiffs' favor—that the adverse employment actions by the defendants were substantially motivated by Wagner's protected speech. The disputed facts require the court to give responsibility for resolving this issue to a jury. Similarly on the fourth prong, the *Mt. Healthy* issue, the question whether the defendants would have taken the same actions against Wagner for legitimate, independent reasons, even if Wagner had never spoken, is a question for the jury.

The conclusion that plaintiffs have presented a valid constitutional claim does not, however, end the court's analysis of the viability of Count One. The court must still address the argument presented by the individual defendants that, even if a jury might conclude that a constitutional violation occurred, they are nevertheless entitled to summary judgment on the ground of qualified immunity. The First Circuit's recent discussion of qualified immunity in *Dirrane v. Brookline Police Dep't*, 315 F.3d 65 (1st Cir.2002), has heavily underlined the importance of careful analysis in this area.[12]

■ As the Court of Appeals noted in *Dirrane:*

> Under section 1983, a government employee is immune to damages where a reasonable official could believe (the test is objective), albeit mistakenly, that his conduct did not violate the First amendment. *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Immunity exists even where the abstract "right" invoked by the plaintiff is well-established, so long as the official could reasonably have believed "on the facts" that no violation existed. *See Suboh v. Dist. Attorney's Office*, 298 F.3d 81, 90 (1st Cir.2002); *Swain v. Spinney*, 117 F.3d 1, 9–10 (1st Cir.1997).

*Id.* at 69

*Dirrane* concerned a police officer who brought frequent complaints to his supervisors about an array of alleged abuses by other police officers. His complaints ranged from relatively minor (*e.g.*, playing cards during work hours) to more serious (*e.g.*, falsifying fingerprint reports and destroying fingerprint evidence). After roughly five years of bringing complaints, the plaintiff was transferred to a different division within the department. Soon thereafter, the plaintiff filed a § 1983 suit against the police department and his supervisors claiming that the transfer constituted retaliation for protected speech.

**12.** In *Bennett v. City of Holyoke*, 230 F.Supp.2d 207 (D.Mass.2002), this court made short shrift of the defendants' qualified immunity argument. The First Circuit's subsequent *Dirrane* decision has made it clear that a more exacting analysis of the issue by the trial court is required.

The court in *Dirrane*, while viewing the evidence as somewhat doubtful, did find that the plaintiff had made out a claim of a "colorable First Amendment violation." *Id.* at 70. Nevertheless, the court concluded that the individual defendants were entitled to the protection of qualified immunity. Significant to the court were the facts that (1) Dirrane was never fired; (2) his serious charges were "nestled in a morass of complaints," and (3) his superiors has "some basis for distrusting Dirrane's judgment." *Id.* Based on this, the Court of Appeals determined that the trial judge was correct in concluding that "this is not a case in which a reasonable officer *must* have known that he was acting unconstitutionally." *Id.* (emphasis in original).

■ As in *Dirrane*, the record before this court simply does not present a case in which the individual defendants "*must* have known" that they were acting unconstitutionally. Like the plaintiff's complaints in *Dirrane*, Wagner's more serious charges—racism and misappropriation of monies belonging to prisoners—were part of a substantial number of complaints, many involving matters of far less significance. Moreover, while the defendants did attempt to discipline Wagner, sometimes unsuccessfully, he was never terminated. Finally, the individual defendants, in disciplining Wagner, were acting pursuant to departmental regulations, codified by Wagner himself when he was chief, that on their face authorized the actions they took. Given all this, it is not necessary for this court to address the vexed issue of whether the defendants had "some basis" for doubting Wagner's judgment. The facts of record in this case, even viewed in the light most favorable to the plaintiff, make it clear that reasonable officials in the defendants' positions at the time *could*

objectively have believed, albeit mistakenly, that their conduct did not violate the First Amendment. The court will allow the defendants' motion for summary judgment regarding Count One with respect to defendants Cournoyer, Donoghue, and Szostkiewicz.

■ The position of the City of Holyoke is different. Qualified immunity does not apply to municipalities. *See Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir.1999). A plaintiff seeking damages against a municipality under § 1983 must demonstrate the existence of "an unconstitutional policy or custom of the municipality itself." *Dirrane*, 315 F.3d at 71. The evidence of such an unconstitutional policy or custom may easily be inferred from the record now before the court. Indeed, the police department's rules and regulations, some of which have already been found to be unconstitutional by this court as a preliminary matter, facilitated and encouraged the unconstitutional behavior by the City's officials. Moreover, the record contains substantial evidence to suggest that retaliation against employees who offered serious criticism of the police department was a longstanding custom on the part of responsible Holyoke officials at the time. The motion for summary judgment with regard to the City on Count One will therefore be denied.

With respect to defendant Arthur Therrien, the record is barren of any evidence to support a § 1983 claim. The only conduct on his part that could conceivably constitute a violation, in some way, of Wagner's rights, were the interdepartmental complaints he filed against Wagner (1) for remarks made about Therrien in Wagner's MCAD and MLRC complaints and statements to the press and (2) in response to the Egan episode.[13] Yet Therrien's

---

**13.** In the amended complaint, Wagner claims

that Therrien, as President of Local 388,

complaints, which he was permitted to file, cannot be construed to implicate him as a willful participant in joint activity with the City of Holyoke against Wagner. The court will therefore allow the motion for summary judgment on Count One against Therrien.

Similarly, though the record bears evidence that Local 409 and the International perhaps did not represent Wagner regarding several of his grievances, no reasonable jury could find these omissions to implicate Local 409 and the International as participants in joint activity with the City of Holyoke in violation of § 1983. The motion for summary judgment regarding Count One with respect to Local 409 and the International will be allowed.

Finally, besides a conclusory say-so, the only evidence of retaliatory conduct by Local 388 is the complaint it filed on behalf of Egan in response to Wagner's alleged improper involvement in the Egan investigation. No reasonable jury could find that this complaint is sufficient to support a valid § 1983 claim.

In sum, the defendants' motion for summary judgment regarding Count One will

be allowed as to all defendants except the City of Holyoke.

**B.** *State Constitutional Claims Under Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (Count Two)*

■ Qualified immunity under § 1983 applies with equal force to claims brought under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I. *See Duarte v. Healy,* 405 Mass. 43, 537 N.E.2d 1230, 1232–33 (1989). Therefore, summary judgment regarding Count Two will be allowed with respect to defendants Cournoyer, Donoghue, and Szostkiewicz. Moreover, for the reasons discussed above, summary judgment will be allowed on Count Two with respect to defendants Therrien, Local 388, Local 409, and the International.

■ The plaintiffs' state civil rights claim against the defendant City of Holyoke also fails, because municipalities are not "persons" within the meaning of the Massachusetts Civil Rights Act. *See Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 747 N.E.2d 729, 744–45 (Mass.2001); *see also Commonwealth v. ELM Med. Laboratories, Inc.,* 33 Mass.App.Ct. 71, 596 N.E.2d 376 (Mass.1992).[14]

---

"filed and continued to file meritless complaints and grievances against Plaintiff Robert Wagner in retaliation for [his] protected actions." (Docket No. 31, at ¶ 69). In their reply brief regarding their motion for partial summary judgment, the plaintiffs allege that Therrien filed approximately eleven formal or informal complaints against Wagner. Aside from the two complaints discussed above, no specification of any other complaints, at any particular time, is offered. Without help, it would be impossible to discern in an extremely voluminous record exactly what complaints the plaintiffs claim are actionable.

Fortunately, Rule 56 assists the court. Therrien's memorandum opposing the plaintiffs' motion for partial summary judgment argued vigorously that *none* of the complaints he filed were actionable. Under well-estab-

lished law, the defendant's argument transferred to the plaintiffs the burden of specifying which complaints which were alleged to be actionable and of demonstrating how their filing violated Wagner's rights. The plaintiffs have failed to do this.

**14.** Because all the defendants are clearly entitled to summary judgment on the grounds described, it is unnecessary to address an additional, probably fatal, deficiency in the record regarding Count Two. The evidence appears insufficient to demonstrate that the plaintiff's exercise of his rights was impaired by "threats, intimidation or coercion," as required by Mass. Gen. Laws ch. 12, § 11I. *See Carvalho v. Town of Westport,* 140 F.Supp.2d 95, 100–01 (D.Mass.2001)(requiring "actual or potential physical confrontation accompanied by a threat of harm").

Regarding Count Two, therefore, the defendants' motion for summary judgment will be allowed, *in toto.*

C. *Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185 (Count Three)*

■ The Massachusetts Whistleblower Statute gives a municipal employee a civil claim for damages against a city or town that takes "retaliatory action" against him "because" he engages in certain protected conduct. Conduct protected by the statute includes disclosing "to a supervisor or to a public body" conduct which the employee "reasonably believes" is in violation of law or poses a risk to the public.

■ The various arguments for summary judgment on Count Three set forth by the defendants in their original submissions have been, again, somewhat overtaken by the First Circuit's *Dirrane* decision, which appears on its face to require dismissal of the plaintiffs' Whistleblower claim for failure to comply with its notice provision.

Mass. Gen. Laws ch. 149, § 185(c)(1) spells out specific requirements for persons who wish to disclose information to a "public body" and receive the protection of the Massachusetts Whistleblower Statute. They must bring the "activity, policy or practice in violation of a law ... to the attention of a supervisor of the employee by written notice" and afford the employer a "reasonable opportunity to correct the activity, policy or practice." Judge Boudin noted in *Dirrane* that these notice provisions are to be observed strictly, since "a hard and fast rule ... avoid[s] uncertainties about what might have happened if formal notice had been given." *Dirrane v. Brookline Police Dep't*, 315 F.3d 65 (1st Cir.2002).

The Whistleblower statute provides that the notice requirements may be waived only under three conditions:

[I]f [the employee]: (A) is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer and the situation is emergency in nature; (B) reasonably fears physical harm as a result of the disclosure provided; or (C) makes the disclosure to a public body as defined in clause (B) or (D) of the definition for "public body" in subsection (a) for the purpose of providing evidence of what the employee reasonably believes to be a crime.

*Id.*

In this case, no evidence supports any argument for exceptions (A) or (B); there was no "emergency" or suggestion of any fear of physical harm. While exception (C), covering disclosures providing evidence of a crime, might apply to some of plaintiff's statements, an examination of *Dirrane* makes it clear that this exception will not save the Whistleblower claim.

In *Dirrane,* the plaintiff reported his complaints about police misconduct, some of them quite serious (*e.g.,* destroying fingerprint evidence), to his superiors and suffered retaliation as a result of his disclosure. The court found that the plaintiff was entitled to the protection of the statute, despite the absence of written notice *at this point.* As Judge Boudin noted, *oral* notice is all that is required when a disclosure of misconduct is made to a superior, because the superior is not an outside "public body" as defined in the statute. *Dirrane,* 315 F.3d at 72.

Although the factual issue did not arise in *Dirrane* (because there the plaintiff only made the disclosures to his superiors) the First Circuit's decision makes clear as a general matter that, in order to enjoy the protection of the statute, absent an exception, an employee must give his employer *written* notice of the misconduct he wishes

to disclose to an outside "public body." So, for example, on the facts of this case, assuming Wagner suffered retaliation as a result of his disclosures to the MLRB or the MCAD, he nevertheless could not invoke the protection of the Whistleblower Statute, and seek damages for that retaliation, unless he had informed his employer, ahead of time and in writing, of the misconduct he was about to disclose to these outside public bodies.

Exception (C), noted above, might absolve Wagner from the notice obligation with regard to his disclosures to the AG's representatives, since these disclosures were arguably made for the purpose of providing evidence of a crime.

*Dirrane*, however, goes a step further and renders the potential application of this exception irrelevant. Having found that the disclosure of the misconduct by Dirrane to his supervisors did not have to be in writing for Dirrane to receive the benefit of the statute, the First Circuit nevertheless affirmed dismissal of the lawsuit for violation of the notice provision. The court concluded that the filing in court of the lawsuit invoking the Whistleblower Statute *itself* constituted a "disclosure" to a "public body," for which prior written notice to the municipality, Brookline, was required. Applying that logic to this case, even if Wagner was permitted to make disclosure of conduct he reasonably believed was a crime to the AG, without informing his superiors or his municipal employer ahead of time, he could not thereafter file a *lawsuit* invoking the Whistleblower Statute and seek damages unless he notified the City of Holyoke ahead of time, in writing, of the conduct he considered to be in violation of law. The effect of *Dirrane*, in other words, is to require plaintiffs under the Whistleblower Statute to notify potential defendants in

writing, in all circumstances, before filing suit.

To understand the impact of *Dirrane*, the following notification scenarios might describe the range of possibilities under the Whistleblower Statute, as recognized by the First Circuit.

*Scenario One:* An employee becomes aware of misconduct, reports it to his superior and suffers retaliation. If he then reports that misconduct to his employer in writing first, he may proceed to file his Whistleblower lawsuit in court and seek damages. If he fails to report the misconduct in writing to his employer before filing suit, his claim must be dismissed. That is the holding in *Dirrane*.

*Scenario Two:* An employee becomes aware of misconduct, reports it to an outside public body (such as the MLRB) in a context that is *not* covered by any of the exceptions to the notification rule, and suffers retaliation. He has *no* claim under the Whistleblower Statute because he did not disclose the misconduct to his employer in writing before going to the MLRB.

*Scenario Three:* An employee becomes aware of misconduct, reports it to an outside public body (such as the AG) in a context that *is* covered by an exception to the notification rule, and suffers retaliation. He is protected by the statute, and may file his Whistleblower lawsuit to obtain damages, *so long* as he notifies his employer in writing before filing the suit. Even here, however, if he fails to notify his employer in writing before filing suit, his complaint must be dismissed.

*Scenario Four:* An employee becomes aware of misconduct, notifies his employer of it in writing, reports it to an outside public body and suffers retaliation. Although the Court of Appeals did not address this situation explicitly, in this instance, presumably, the victim of retalia-

tion could proceed to file his complaint directly and pursue his claim for damages under the Whistleblower Statute, since his employer had already received the required prior written notification.

In this case, the plaintiff made a number of disclosures to outside public bodies, such as the MCAD and the MLRB, without notifying his employer in writing ahead of time. No exception to the notification requirement applied. Under Scenario Two noted above, therefore, any claim for damages under the Whistleblower Statute for retaliation prompted by these disclosures must be dismissed. On the other hand, Wagner's disclosures to the AG, as noted, appear to have been covered by Exception (C) to the notification requirement. Even so, his filing of the lawsuit—which under *Dirrane* itself constituted a disclosure to an outside "public body"—was not preceded by written notification to the employer City of Holyoke. This portion of Wagner's Whistleblower claim is therefore also subject to dismissal, as noted in Scenario Three above. The upshot of *Diranne* is that *all* of Wagner's Whistleblower claim must be dismissed.

The First Circuit's parsing of the Whistleblower Statute is troubling. A strong argument could be made that the statute requires only oral or written notification to the employer of the *misconduct* prior to the disclosure to the outside public body. Even this notification is not required if an exception applies. Under this alternate construction of the statute, the mechanics of the law would be more generous than *Dirrane* contemplates. Following proper oral or written notification of the *misconduct* (or even without notification where an exception applies), the employee could make his disclosure, and if he *then* suf-

fered retaliation, he could proceed to court directly to seek damages, without any further requirement to make written notification. In other words, under this construction of the statute no requirement would exist to notify the employer in writing prior to initiating the *lawsuit* seeking damages for the prohibited retaliation.

Plaintiffs argue that the First Circuit's construction of the notice provisions of the Whistleblower statute is so implausible that this court should either not follow it, or should certify the issue to the Massachusetts Supreme Judicial Court to obtain a definitive interpretation of the statute. This the court will not do. Certainly, the *Dirrane* gloss on the law's notice requirements will make it harder for employees to avoid the statute's potholes and receive its protections, especially if they are not represented by counsel at any early stage. On the other hand, while the more generous alternate construction of the notice provision has its attractions, the *Dirrane* approach is not without support. Courts, after all, are specifically included within the definition of "public body." Moreover, one goal of the notice provision seems to have been to insure that in most circumstances employers will be made aware, in no uncertain terms, of the substance of the employee's information regarding misconduct before that information is made public. This interest is served by the First Circuit's strict pre-filing written disclosure rule.

In any event, the First Circuit has spoken, and its edict is binding on this court. For this reason, the court will allow the defendants' motion for summary judgment on Count Three in its entirety.[15]

---

**15.** In view of the fatal impact of *Dirrane,* it is unnecessary for the court to address the defendants' arguments regarding waiver and the inapplicability of the Whistleblower Statute to individuals or unions.

D. *Massachusetts Privacy Act, Mass. Gen. Laws ch. 214 § 1B (Count Eight)*

Under Massachusetts law, "A person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. The plaintiffs' only claims under this statute stem from the alleged breach of privacy by Cournoyer when he (1) allegedly posted a copy of a doctor's note stating that Wagner would be unable to work because of hypertension and (2) released the results of Dr. Katz's psychiatric examination to a person or persons who had no need to see it, one of whom may have shared the information with an editor for the Holyoke Sun.

■ Under Massachusetts law, public disclosure of private information must be unreasonable to constitute invasion of privacy. *See Pendleton v. City of Haverhill*, 156 F.3d 57, 64 (1st Cir.1998); *Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 134 (1984). To fall under the protection of the Massachusetts privacy statute, disclosed facts must be "of a highly personal or intimate nature." *Bratt*, 467 N.E.2d at 133–34; *see also Warner–Lambert v. Execuquest Corp.*, 427 Mass. 46, 691 N.E.2d 545, 548 (1998); *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908 (1986). Moreover, there can be no invasion of privacy where facts, though highly personal, are already in the public domain. *See Brown v. Hearst Corp.*, 862 F.Supp. 622, 631 (D.Mass.1994) (no invasion of privacy where facts revealed in television broadcast already had been exposed in divorce trial and three newspaper articles), *aff'd*, 54 F.3d 21 (1st Cir.1995); *see also Pendleton v. City of Haverhill*, 156 F.3d 57, 64 (1st Cir.1998).

■ Disclosure to the broad public is not necessarily required for a valid privacy claim. The disclosure of facts between coworkers is sufficient to violate privacy. *See Bratt v. Int'l Bus. Mach. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 134 (1984) ("[T]he disclosure of private facts about an employee among other employees in the same corporation can constitute sufficient publication under the Massachusetts right of privacy statute."). In such cases, however, the employee's interest in preserving confidentiality of contents of personnel files such as medical facts concerning their health may be subsumed by "countervailing business interests." *Id.* at 135. Nevertheless, "in the area of private employment there may be inquiries of a personal nature that are unreasonably intrusive and no business of the employer ...." *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908, 912 n. 9 (1982).

■ Drawing all inferences in favor of the plaintiffs, a reasonable jury could conclude that Cournoyer violated the privacy statute by publicly distributing Wagner's psychiatric evaluation and doctor's note. Both documents were obviously personal in nature. Although the defendants claim that Cournoyer distributed the psychiatric report to Wagner's supervisors only, so that they could assess Wagner's fitness for duty, the defendants fail to justify the distribution of the report to officers who were not Wagner's supervisors. Defendants have offered no countervailing interest justifying the public posting of the doctor's note, beyond denying that Cournoyer had anything to do with it.

Because the record indicates that Cournoyer was the only defendant whose conduct even arguably violated Wagner's privacy rights, the court will enter summary judgment as to all other defendants on Count Three. With regard to Cournoyer, the motion will be denied.

E. *Defamation (Count Nine)*

Plaintiffs' claim for defamation is limited to certain remarks allegedly made by de-

fendant Cournoyer about Wagner. The defendants' motion for summary judgment on this count is, in turn, limited to a portion of Cournoyer's allegedly defamatory statements.

■■■■ "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community." *Grande & Son, Inc. v. Chace,* 333 Mass. 166, 129 N.E.2d 898, 899 (1955). To prove defamation, a plaintiff must further demonstrate that the words "discredit[ ] the plaintiff in the minds of any considerable and respectable class of the community." *Muchnick v. Post Pub. Co.,* 332 Mass. 304, 125 N.E.2d 137, 138 (1955). Statements of fact or of opinion are by law not defamatory. *See Rotkiewicz v. Sadowsky,* 431 Mass. 748, 730 N.E.2d 282, 290 (2000) ("[M]any of the statements ... were, as a matter of law, not objectionable, either because they were true, or because they were subjective statements of opinion, and as such were not susceptible of being proven false.").

A plaintiff seeking summary judgment on a defamation claim has a somewhat uphill climb. Long ago, the Massachusetts Supreme Judicial Court wrote, "[t]he question ... whether a publication is defamatory or not, being dependent upon the effect produced upon the public or a considerable part of it, is one particularly fit for trial by jury." *Ingalls v. Hastings & Sons Pub. Co.,* 304 Mass. 31, 22 N.E.2d 657, 659 (1939). Thus, a motion for summary judgment will not be allowed unless the "statement complained of is not reasonably capable of being understood in a defamatory sense to the discredit of plaintiff in minds of a considerable and respectable class of the community." *Poland v. Post Publ'g Co.,* 330 Mass. 701, 116 N.E.2d 860 (1953).

The defendants' motion focuses in on comments supposedly made by Cournoyer in February 1999 regarding the death threat against Wagner.[16] In particular, they contend that summary judgment should enter in Cournoyer's favor regarding three statements. Of the death threat, as noted, Cournoyer was reported to have remarked, "This reeks of a half-hearted attempt to continue a five-year attack on this city's officials and the police department Sergeant Wagner once commanded." A February 24, 1999 Union News article quoted Cournoyer describing the death threat as "just another ploy by this group of individuals to embarrass the department and the citizens of Holyoke—this group of malcontents that have constantly barraged the city of Holyoke with complaints." Additionally, Cournoyer allegedly told Union News reporter Martin Lauer that Wagner had concocted the report of a death threat as part of his continuing "war" with the Szostkiewicz administration.

■■■ The defendants argue that all three statements, as opinions, were protected speech. The well-known rule is that opinions are generally not actionable, unless the statement in question "implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Nat'l Assoc. of Gov't Employees, Inc. v. Cent. Broad. Corp.,* 379 Mass. 220, 396 N.E.2d 996, 1000 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *see also Lyons v. Globe Newspaper Co.,* 415 Mass. 258, 612 N.E.2d 1158, 1161 (1993).

■■■ The defendants' argument receives support from the Massachusetts Supreme Judicial Court's decision in *Bain v. City of Springfield,* 424 Mass. 758, 678 N.E.2d 155 (1997). In that case the plain-

---

**16.** The defendants do not seek summary judgment with respect to Cournoyer's later comments in connection with the death threat made to the television station WWLP.

tiff, a municipal employee, had claimed that certain comments by the Mayor of Springfield constituted retaliation against her for her complaints of gender discrimination. The mayor had commented that the plaintiff's accusations of bias, which had been published in the local newspaper, were "baseless," "meritless," and "an example of someone trying to manipulate the civil rights laws for personal gain." *Id.* at 157–58. The *Bain* court noted that the mayor "was entitled to respond in the same forum, to defend himself and to state what political judgments seemed appropriate so long as they were not defamatory— which these were not." *Id.* at 766, 678 N.E.2d 155.

Although *Bain* is not precisely on all fours with this case, its logic guides the ruling on the defendants' motion. The plaintiff and his supervisors at the police department had been embroiled in an ugly controversy, much of it reported in the newspapers, for some time. Wagner's report of the death threat certainly cast the department, once more, in a bad light. Perhaps the bad light was deserved, perhaps not. Nevertheless, Cournoyer as chief of police had the right to sharply question the *bona fides* of the threat and condemn it as nonsense, if that was his opinion. The alleged defamatory words did no more than that, and are therefore not actionable. To fashion the words of Justice Scalia to the present context, defamation law is not meant "to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 392, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

For the foregoing reasons, the defendants' motion for summary judgment regarding the statements quoted above will be allowed. Other statements of Cournoyer, who is the only defendant charged with defamation, are not the subject of any motion and remain for trial.

### F. *Plaintiffs' Motion for Partial Summary Judgment*

The plaintiffs have moved for partial summary judgment against the defendants City of Holyoke, Szostkiewicz, Cournoyer, and Therrien with respect to retaliation claims contained in Counts One, Two, Three, Four, Five, Seven, and Ten and with respect to their claim of unconstitutional application of Holyoke Police Department Regulations 1.24, 1.26, and 1.30 to Wagner.[17] In addressing this motion, the court must now shift its focus, and view the facts in the light most favorable to the defendants.

The plaintiffs offer two arguments with respect to the retaliation claims: (1) that the discipline imposed on Wagner for statements made or documents submitted to the MCAD and MLRC violated an absolute privilege protecting statements made in the course of litigation and related to that litigation; and (2) that the disciplines imposed on Wagner for statements made to these same state agencies violated his right to petition the government for redress of grievances as a matter of law.

The authority cited by plaintiffs in favor of the former proposition is unconvincing. It is true that statements made during the course of litigation, generally speaking, are privileged, to the extent that courts will not countenance subsequent actions for defamation or intentional inflic-

---

**17.** The court's rulings in favor of the defendants on Counts One through Three, leaving only the City of Holyoke on Count One, and the other two counts entirely out of the case, obviously undercut plaintiffs' motion substantially for reasons independent of the discussion that follows.

tion of emotional distress actions based on these statements. In this case, of course, Wagner has not been targeted for a lawsuit based on his submissions to the MLRB and MCAD; he has merely been disciplined by his employer. More importantly, defendants deny imposing any discipline based on the fact that Wagner made statements to the agencies. Viewing the facts now from the perspective of the defendants, Wagner was disciplined, not for submissions to the agencies, but for disclosing documents in violation of departmental regulations. In essence, the defendants' argument is that they would have taken the same action against him if he had published the documents in the newspaper, or posted them at a bus stop. The violation of the rules (*i.e.,* the improper disclosure), not the filing with the agency, prompted the discipline.

The scope of Wagner's immunity from *discipline* based on his violation of departmental rules is simply not as sweeping as plaintiffs suggest. To take an example, suppose a police officer removed a confidential document from police files containing the name of an informant and appended it to a public document filed with a state agency, with the result that the informant was exposed and injured. Under these circumstances no authority plaintiffs have cited, or that the court has located, would prevent the employer from taking disciplinary action against the officer, based, not on the public filing, but on the improper public disclosure of the sensitive information. Viewing the facts in the light most favorable to defendants, it was the rule violation, not the public filing, that led to Wagner's discipline here. Plaintiffs are

not entitled to summary judgment in these circumstances.

Plaintiffs' second argument is similarly unavailing. The right to petition the government for grievances is not unlimited. As the Supreme Court noted,

> [A] pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused.... Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

*Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *see also Yatvin v. Madison Metro. Sch. Dist.,* 840 F.2d 412, 419 (7th Cir.1988) ("[N]ot every legal gesture—not every legal pleading—is protected by the First Amendment.").

In this case, there are too many outstanding issues of fact for the court to determine whether, as a matter of law, the defendants violated Wagner's right to petition the government for redress. The defendants vigorously deny the substance of Wagner's grievances, categorizing many of Wagner's allegations as outright fabrications. Based on the factual record, a reasonable jury might find that Wagner's grievances did abuse the administrative relief process. This issue must await trial.

Similarly, it would be premature for the court to decide whether the defendants unconstitutionally applied Holyoke Police Department Regulations 1.24, 1.26, and 1.30 to the plaintiff.[18] There are too many

---

**18.** As mentioned above, the court previously found that only Holyoke Police Department Regulations 1.26 and 1.95 were facially unconstitutional. In the same opinion, the court declined to find that the Holyoke Police Department Regulations were unconstitution-

al as applied to Wagner, citing the plethora of remaining factual determinations. The court delayed making such a decision "until the record can be more fully developed through further preliminary hearings or a trial on the merits." (Docket No. 64, at 10).

outstanding issues of fact for the court to say, as a matter of law, that the defendants violated Wagner's First Amendment rights. A jury may conclude that no causal relation existed between the discipline and any protected expression, or it may determine that the employer would have imposed the same discipline even if Wagner had never spoken. A trial is necessary to explore these, and perhaps other related, issues.

For the foregoing reasons, the court will deny the plaintiffs' motion for partial summary judgment.

### VI. *Conclusion*

For the reasons set forth above, regarding the defendants' motion for Partial Summary Judgment, the court rules as follows:

The motion is ALLOWED as to Count One, except as to defendant City of Holyoke.

The motion is ALLOWED as to Count Two in its entirety.

The motion is ALLOWED as to Count Three in its entirety.

The motion is DENIED as to Count Eight, with regard to the defendant Cournoyer. No other defendant is named on this count.

The motion for partial summary judgment is ALLOWED as to Count Nine.

Regarding the plaintiffs' motion for partial summary judgment, the motion is DENIED.

A separate Order will issue.

### ORDER

For the reasons set forth in the attached Memorandum, defendants' Motion for Partial Summary Judgment (Docket No. 137) is hereby ALLOWED in part and DENIED in part and the plaintiff's Motion for Partial Summary Judgment (Docket No. 142) is hereby DENIED *in toto.*

Regarding the defendants' Motion for Partial Summary Judgment:

The motion is ALLOWED as to Count One, except as to defendant City of Holyoke.

The motion is ALLOWED as to Count Two *in toto.*

The motion is ALLOWED as to Count Three in its entirety.

The motion is DENIED as to Count Eight with regard to defendant Cournoyer. No other defendant is named in this count.

The motion is ALLOWED as to Count Nine.

It is So Ordered.